UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBORAH RYAN,

               Plaintiff,

                                        Civil Action No. 11-CV-10900

v.

                                    HON. MARK A. GOLDSMITH

CITY OF DETROIT, et al.,

               Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART THE CANTON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 93) AND DENYING THE CANTON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AS MOOT (DKT. 81)

### I. INTRODUCTION

This is a civil rights case brought under 42 U.S.C. § 1983 with pendent state-law claims for gross negligence and wrongful death.   Plaintiff Deborah Ryan, in her individual capacity and as the representative of the estate of her daughter, Patricia "Katie" Williams, alleges that Defendants City of Detroit, Detroit police officers Barabara Kozloff and Dwane Blackmon, City of Canton, and Canton police officers Mark Schultz and Adam Falk failed to response properly to domestic violence committed by Ed Williams upon his wife, Katie Williams.   Plaintiff alleges that this failure enabled Ed, ultimately, to murder Katie.   In her § 1983 claim premised on the equal protection clause, Plaintiff alleges that Katie's report of domestic violence was treated differently based on the fact that her assailant was a police officer.

Before the Court is a motion for summary judgment (Dkt. 93) by Defendants Canton, Schultz and Falk (collectively "Defendants" or "the Canton Defendants"), which argues that the

equal protection claim – the sole claim asserted against them – should be dismissed.  For the reasons set forth below, the Court grants the motion in favor of Canton, but denies the motion with respect to Falk and Schultz.

## II. BACKGROUND

### A. The Events that Occurred between September 19, 2009 and September 22, 2009 Relating to Ed Williams and Katie Williams

Ed Williams, a Detroit Police Department ("DPD") homicide detective, was married to Katie Williams, a DPD academy instructor.  By 2009, the couple had been married for approximately three years and owned a home on Wall Street in Canton, Michigan.  9/20/2009 Falk Report at 1 (Dkt. 107-5).  Ed and Katie had marital difficulties, however, and, by September 2009, they had not been living together for two months.  Id.

At about 9:45 p.m. on the evening of Saturday, September 19, 2009, Ed came to the Wall Street home and found Katie talking to her boyfriend, Clifford Lee, on the phone.  Video Tr. at 6-7 (Dkt. 106-3).  An argument ensued, which culminated in Ed pushing Katie to the ground; Katie sustained a cut on her right cheek.  Id.  Shortly after midnight, Katie and Lee arrived at the Canton Police Department ("CPD") headquarters and requested a police escort to accompany Katie back into the home.  Falk Report at 1; Falk Dep. at 15-17 (Dkt. 106-2).

Officer Adam Falk was on duty at the CPD headquarters and interviewed Katie.  Falk Dep. at 10.  Katie described the domestic violence episode with her husband, but refused to provide her name or Ed's name.  Id. at 14-17.  Katie told Falk that she and her husband were both Detroit police officers and that she did not want Ed to lose his job.  Video Tr. at 5, 8.

Falk informed Katie that all he could do was write a report and let the prosecutor make the determination whether Ed would be charged.  Id. at 6.  Falk said that he would write a report, but

2

would not seek the arrest of Ed based on the information Katie gave him.   Id. at 13.   Falk also mentioned that the report was a "cover our ass thing," in case "something really serious happens." Id. at 9, 17.   Katie then left the CPD headquarters with Lee.   Falk Dep. at 17.   Just before she left the police headquarters, Falk asked Katie "Do you still want anybody to go over to the house?" Katie responded "No."   Video Tr. at 18.

Falk prepared a report of his interview with Katie.   The report described the incident as a "civil matter" with a disposition of "closed, for documentation only at this time."   Falk Report at 1-2.   Falk's report recounts his encounter with Katie and Lee, including Katie's account of the events where Ed pushed her and she sustained a cut on her cheek.   Id.   The report also notes that Katie did not want to file a report, and that she wanted a police escort to her home to collect some things, known as a "civil standby," but then stated that she did not want any assistance and left the station.   Id.   According to the report, Falk communicated this encounter to his supervisors.   Id. at 2.

Katie then returned home the morning of September 20, accompanied by Plaintiff, her mother.   Deborah Ryan Dep. at 60-65 (Dkt. 107-3).   Katie entered the home unaware that Ed was there.   Id.   According to Plaintiff, the women had an altercation with Ed, which involved yelling and a scuffle.   Id.   During this incident, Ed was holding a handgun and intoxicated.   Id. Plaintiff called the Canton police for help, but when the police arrived they found that Ed had fled. Id. at 72.   They also found that Ed had left a note, which one of the responding officers, Lieutenant Mark Schultz, considered to be a "suicide note."[1]   Schultz Dep. at 111.

---

[1] The note stated "I Edward G. Williams II of sound mind (a little pissed off though), hereby leave all worldly possessions to my mother, Wanda Williams.   This is to include all life insurance policies and bank accounts."   Note (Dkt. 107-6).

Shortly after Ed had fled, Schultz issued a notice through the Law Enforcement Information Network (LEIN) regarding Ed.[2]   LEIN Notice (Dkt. 106-6).   Schultz also contacted DPD to notify them of the incident between two of its officers.   Schultz Dep. at 57-58.   The transcript of Schultz's initial call to Sergeant Martel of DPD reveals that he wanted DPD apprised of the situation so that it would "get a hold of" Ed.   Call Tr. at 5 (Dkt. 107-8).   Schultz explained to Martel that he did not think the domestic violence incident would get a full investigation because (i) CPD did not have enough information, (ii) initially, Katie did not provide her name, and (iii) Falk had only written a civil report.   Id. at 11.   Schultz also told Martel that he was concerned that there may be a "workplace issue" because, from Schultz's understanding, Ed did not know the identity of Katie's boyfriend, Lee, a fellow DPD officer.   Id. at 12-14.

In deposition, Schultz testified that if DPD wanted to do an internal investigation, CPD would provide DPD with information.   Id. at 59.   Schultz also stated that he hoped that DPD could get a hold of Ed to assess his "mental state."   Id.

CPD Officer Michael Steckel, an officer who assisted Schultz on September 20, 2009, also testified that CPD contacted DPD.   Steckel Dep. at 9 (Dkt. 106-9).   Steckel stated that Ed "could either come to the Canton Police Department or he could go to the supervisor's office at Detroit P.D. and we would make our decision based on what they had to say about if it was good enough to remove him from LEIN."   Id. at 24.

According to Schultz, he had a brief conversation with Ed a little after 6 p.m. on September 20, 2009.   Schultz Dep. at 82, 86.   Schultz told Ed that he knew Ed had left the note.   Ed responded that the note did not mean anything.   Id. at 83.   Schultz also told Ed that he had entered

---

[2] "DPD officer, intox, no known veh reg, after domestic situation left a suicide note, poss left home with a handgun, if any contact use caution and call Canton PD."   LIEN Notice (Dkt. 106-6).

the LEIN notice, listing him as a "missing person endangered."   Id.   Schultz said that he would not remove the notice until Ed came to see Schultz or went to his supervisor at DPD.   Id.   Ed said that he was closer to Detroit, so Schultz told Ed to have his supervisor call him when he got to DPD.   Id.

Although it is not entirely clear from the record, apparently Schultz notified DPD that Ed was coming to check-in with them.   Id. at 57, 59.   At some point prior to Ed's arrival at DPD, DPD determined that Sergeant Barbara Kozloff of DPD would speak with Ed.   Kozloff testified that, prior to meeting Ed, she had a phone call with Schultz.   Schultz apprised Kozloff of the basic facts of the morning incident in Canton.   Kozloff Dep. at 55 (Dkt. 107-11).   Kozloff testified that she asked Schultz if she had to take Ed into custody.   Id.   Schultz said no because there was no probable cause to arrest Ed.   Id.

DPD Lieutenant Dwane Blackmon and Sergeant Martel also spoke with Kozloff prior to Ed's arrival and provided her with some information regarding the incident of Ed leaving the Canton home that morning.   Kozloff Dep. at 40-41, 73.

Upon arriving at DPD, Ed met with Kozloff.   Id. at 75.   Ed told Kozloff of his marital strife, relating the argument with Katie that morning at the Canton home.   Id. at 78.   Kozloff also testified that Ed stated that when Ed heard police sirens, he left the home.   Id. at 79.   Kozloff did not inquire further because she had not been apprised of any other facts by Blackmon, Martel, or Schultz.   Kozloff Dep. at 41, 45, 49, 61-62.

After meeting with Ed, Kozloff called Schultz at approximately 6:30 p.m. and told him that "all is well" with Ed.   Schultz Dep. at 92.   Relying on Kozloff's representation that "all is well,"

Schultz removed the LEIN notice.   Id.   The timing of the LEIN notice removal is unclear from the record.

Late in the evening the next day, Monday, September 21, 2009, Ed and Katie spoke on the phone and agreed to meet the next morning in the Canton public library parking lot.   DPD Report at 3 (Dkt. 106-2).   On September 22, 2009, Ed and Katie met as planned at approximately 8 a.m. and spent about an hour talking on a bench near the parking lot.   Id.   After about an hour, the couple got up from the bench, and Ed retrieved a personal handgun from his car.   Id.   Ed then shot and killed Katie with his personal handgun in the parking lot.   Id.   He then committed suicide by turning the gun on himself.   Id.

### B. CPD Policies on Domestic Violence

Relevant to the case are CPD's policies and practices concerning domestic violence intervention operations.   According to the Domestic Intervention Operations Policy ("DIO Policy") published by CPD, the department established "a uniform policy" to "eliminate indecision in the minds of officers and create confidence when exercising judgment in the performance of their duties."   DIO Policy at 1 (Dkt. 106-7).   The policy states that at an "on-scene investigation," an officer should "interview all parties," such as the "victim, suspect, and other witnesses."   Id. at 5.   When "responding to a domestic violence call, the officers shall . . . arrest the assailant whenever possible when probable cause is established."   Id. at 7.

The DIO Policy also maintains that officers "should not consider the wishes of either party concerning the arrest or prosecution" or "the occupation of either party."   Id. at 9.   The policy further provides that police officers "shall provide all victims of domestic violence with referral information" for a victim assistance program.   Id. at 10-11.

6

Aside from the language of the DIO Policy, CPD officers testified to CPD's practices. CPD Sergeant Craig Wilshire testified that filing a report is not a prerequisite for receiving protective assistance in Canton, and a citizen's refusal to identify herself is not grounds to deny such assistance.   Wilshire Dep. at 34-35 (Dkt. 107-4).

Falk testified that the decision to arrest a domestic violence perpetrator is based on the "reasonableness" of the situation, and there is no requirement that an arrest be made "in a day or two or three."   Falk Dep. at 35-36.   In the case of Ed, Falk said that the Canton police could have arrested him because Ed was not a cooperating witness.   Id. at 32.

Schultz stated that "our normal policy would have been in this situation to have it reviewed by a prosecutor once all the information was obtained and Mr. Williams could have been interviewed in reference to the domestic issue."   Schultz Dep. at 66.

CPD Deputy Chief Robert Kerr also testified about CPD's policies and practices, pursuant to Federal Rule of Civil Procedure 30(b)(6).   With respect to the DIO Policy outlining "Arrest Policies and Procedures," Kerr affirmed that "officers responding to the scene of a domestic violence situation should arrest the assailant in all of the following circumstances . . . [including] misdemeanor assault, assault and battery, or aggravated assault based on reasonable cause where a domestic relationship exists."   Robert Kerr Dep. at 53-54 (Dkts. 93-2 and 106-8).[3]   Kerr testified that the phrase "should arrest" does not mean that an officer must arrest the suspect.   Id. at 54.

Rather, according to Kerr, when a CPD officer has probable cause to believe that domestic violence has been committed, the officer may (i) write a report, (ii) request a warrant, (iii) make an arrest, or (iv) initiate a criminal investigation.   Id. at 43.   In situations where an assailant cannot

---

[3] According to the DIO policy, "reasonable cause" is defined "as synonymous with probable cause."   DIO Policy at 2.

be located, officers should attempt to locate the assailant and obtain a statement.   Id. at 52.   When an assailant cannot be located, CPD's policy allows waiting only until the end of the officer's shift, at which time an arrest warrant must be sought.   Id. at 44.

In most cases, CPD does not notify an employer that one of its employees may have engaged in domestic violence.   Id. at 41.   However, in the case of suspected domestic violence by a member of a law enforcement agency, CPD officers sometimes let the other agency know that one of its employees may have committed domestic violence so as to inform it that "a member of their agency . . . has potentially engaged in criminal activity."   Id. at 42.

With respect to Ed's conduct, CPD officers stated that there likely were sufficient grounds for probable cause to arrest Ed.   Schultz testified that he thought Falk "would have had probable cause to believe a crime was committed" if Katie had been believable when she first came to CPD. Schultz Dep. at 122-123.   After Ed fled the Williams' home and CPD knew his identity, Schultz added that CPD "would have held off" making an arrest "until we could talk to Ed."   Id. at 123.

Kerr testified that there "could have been sufficient grounds" for reasonable cause to arrest Ed, but added that "without further investigation" and not having been there, he was "reluctant to put an absolute on that…."   Kerr. Dep. at 20 (Dkt. 106-8).   However, according to Kerr, there would have been sufficient grounds to pursue further investigation, such as interviewing Ed.   Id. at 20, 52.   This procedure of interviewing a suspected assailant is included in CPD's policies.   Id. at 20-21.   DIO Policy at 5.

**C. Procedural Background**

8

On March 7, 2011, Plaintiff filed her original complaint (Dkt. 1).   After some discovery, the Court granted Plaintiff's motion for leave to amend her complaint (Dkt. 57), so that she could name the Canton Defendants.   The amended complaint (Dkt. 59) contains six claims for relief:

Count I (against City of Detroit, Kozloff, and Blackmon): Denial of due process under § 1983.

Count II (against all Defendants): Denial of Equal Protection under § 1983.

Count III (against City of Detroit): "42 U.S.C. § 1983 – Monell claim."

Count IV (against of City of Canton): "42 U.S.C. § 1983 – Monell claim."

Count V (against Kozloff and Blackmon): Gross Negligence.

Count VI: Wrongful Death.[4]

### III. SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   When evaluating a summary judgment motion,

credibility judgments and weighing of the evidence are prohibited.  Rather, the evidence should be viewed in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).   Thus, the facts and any inferences that can be drawn from those facts must be viewed in the light most favorable to the non-moving party.   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Biegas v. Quickway Carriers, 573 F.3d 365, 373 (6th Cir. 2009) (quotation marks and brackets omitted).

When a defendant seeks summary judgment, the defendant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the

---

[4] This count does not assert a claim against any defendant, but simply recites that the action seeks relief pursuant to the Michigan Wrongful Death Act, Mich. Comp. Laws § 600.2922, et seq.

9

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quotation marks omitted).   "But there is 'no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.'"   Harvey v. Campbell Cnty., 453 F. App'x 557, 560 (6th Cir. 2011) (quoting Celotex, 477 U.S. at 323).   "To withstand summary judgment, the nonmoving party must present sufficient evidence to create a genuine issue of material fact."   Humenny v. Genex Corp., 390 F.3d 901, 904 (6th Cir. 2004).   A mere scintilla of evidence is insufficient; rather, "there must be evidence on which the jury could reasonably find for the nonmovant.   Id. (quotation marks and brackets omitted).

## IV. ANALYSIS

Defendants argue that summary judgment should be granted in their favor on Plaintiff's claims against them.   The claims against Canton and its two officers are related and yet distinct. While the claims against Canton and its officers are both grounded in an alleged deprivation of equal protection, the claim against Canton is only viable if the deprivation derives from a "custom or policy" of Canton.   As elaborated below, the Court concludes that Plaintiff has failed to raise a triable issue of fact that Canton has adopted a custom or policy that deprives victims of domestic violence of the equal protection of the laws when their assailants are law enforcement personnel. Therefore, summary judgment will be entered in favor of Canton on the claim against it. However, summary judgment against the individual CPD officers Falk and Schultz will be denied because the defense of qualified immunity – the sole defense argued on their behalf in the motion – has not been properly supported.

10

### A.   The Equal Protection Claim Against Canton

Plaintiff's equal protection claim is grounded in the theory that Katie was treated differently and adversely because her assailant was a police officer.[5]   Specifically, Plaintiff alleges that CPD officers deviated from CPD's standard written policy for investigating domestic violence cases and treated Katie differently than would have been the case had her assailant been a civilian.   Plaintiff points out that the CPD officers who handled her case, Schultz and Falk, (i) did not interview Ed, (ii) did not attempt to arrest Ed, (iii) failed to instruct DPD to arrest Ed, and (iv) inexplicably failed to seek an arrest warrant by the end of September 20, 2009.   Pl.'s Resp. at 10-11.   Plaintiff claims that CPD notified DPD of its investigation and "delegated to DPD its decision whether to pursue or drop the criminal investigation and the LEIN alert even though the case arose in Canton's jurisdiction."   Id. at 14.   Plaintiff asserts that "this practice of delegation and abdication is Canton's policy."   Id.

In the instant motion, Canton argues that Plaintiff has failed to offer any proof that it treated Katie differently because her alleged domestic violence assailant was a police officer. Defs.' Mot. at 9.   Canton further argues that it did not have a custom or policy of treating

---

[5] Plaintiff spelled out her theory in the first amended complaint.   In Count II, denominated as an equal protection claim against all Defendants, Plaintiff alleges that "Defendants encountered, responded to and treated Plaintiff's decedent differently, adversely and more injuriously due to her status as a victim of domestic violence inflicted by a Detroit Police Officer than they would have encountered, responded to and treated her, had she been a victim of domestic violence, inflicted by a person other than a police officer."   First Am. Compl. ¶ 63.   In Count IV, an equal protection claim asserted solely against Canton under Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978), Plaintiff alleges that Canton adopted policies, customs and practices that treated persons victimized by domestic violence perpetrated by police officers "more adversely and injuriously" than "victims of non-police officer domestic abuse."   Id. ¶¶ 48, 71.   In her response to the summary judgment motion (Dkt. 106), Plaintiff claimed that she was "discriminated against based on her membership in a class of domestic violence victims whose assailants are police officers."   Pl.'s Resp. at 19 n. 1.

11

differently victims of domestic violence whose assailants are police officers.   Id. at 13.   Even if it had such a policy, Canton maintains that a rational basis supports it and that any such policy was not the "moving force" that caused Katie's death.   See id. at 16-19.[6]

The Court agrees with Canton that Plaintiff has failed to establish a triable issue of fact that Canton had a custom or policy of treating differently victims of domestic violence whose assailants are police officers.   As explained below, there is no evidence that any Canton official with policy-making authority established any such discriminatory policy, nor is there any evidence that domestic violence victims, as a class, were treated adversely.   The Court also agrees that, to the extent there is a practice of notifying other law enforcement agencies that their personnel were under investigation, there is a rational basis for that practice.[7]

The principal deficiency in Plaintiff's claim against Canton derives from her inability to satisfy the "custom or policy" requirement of 42 U.S.C. § 1983 – the statute upon which she relies for her equal protection claim.[8]

_____

[6] Given the Court's disposition of the issues, there is no need to address whether Canton's alleged policy caused Katie's death.

[7] Curiously, Defendants devote a considerable portion of their argument in support of summary judgment relying on principles of substantive due process.   See Defs.' Mot. at 5-9.   This is inappropriate because that doctrine is separate from the doctrine of equal protection.   See Gutzwiller v. Fenik, 860 F.2d 1317, 1328 (explaining that "the concepts of equal protection and substantive due process are defined differently").   Even the authority that Defendants cite in support of their substantive due process arguments recognizes the distinct nature of equal protection claims.   See, e.g., Gazette v. City of Pontiac, 41 F.3d 1061, 1065-1067 (6th Cir. 1994) (analyzing substantive due process claim apart from equal protection claim); Cellini v. City of Sterling Heights, 856 F. Supp. 1215, 1219-1222 (E.D. Mich. 1994) (same).   Plaintiff asserts only an equal protection claim against the Canton Defendants; she does not assert any due process claim against them.   Therefore, the Court rejects these arguments and bases its ruling solely on the equal protection doctrine.

[8] 42 U.S.C. § 1983 provides, in pertinent part, as follows:

A local government may be liable as a "person" under 42 U.S.C. § 1983 only if an "official policy is responsible for a deprivation of rights protected by the Constitution."   Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 690-691 (1978).   The policy need not be formal; an informal policy or "custom" can exist, "even though such a custom has not received formal approval through the body's official decisionmaking channels."   Monell, 436 U.S. at 691; Cellini v. City of Sterling Heights, 856 F. Supp. 1215, 1220 (E.D. Mich. 1994).   As the U.S. Supreme Court explained, "Congress included customs and usages in § 1983 because of the persistent and widespread discriminatory practices of state officials."   Monell, 436 U.S. at 691 (brackets omitted).   "Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."   Id.

However, municipal liability for the actions of employees may not be based on a theory of respondeat superior; the local government, through its policy, must be the "moving force" behind the injury.   Fox v. Van Oosterum, 176 F.3d 342, 345 (6th Cir. 1999).   The liability of a local government under § 1983 "depends solely on whether the plaintiff's constitutional rights have been violated as a result of a 'policy' or 'custom' attributable to the local government."   Holloway v. Brush, 220 F.3d 767, 772 (6th Cir. 2000).   A plaintiff "has the burden of proof for establishing the existence of an unconstitutional policy and demonstrating the link between the policy and the alleged injuries at issue."   Bennett v. City of Eastpointe, 410 F.3d 810, 819 (6th Cir. 2005).

---

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

For a local government to be held liable for a policy decision of an individual, rather than the enactment of an officially designated legislative organ, the Supreme Court has explained that the individual must hold final and unreviewable policy-making power:

> Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official – even a policymaking official – has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.
>
> \*   \*   \*
>
> We hold that municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.

Pembaur v. City of Cincinnati, 475 U.S. 469, 482-483 (1986) (footnotes and citations omitted).

Thus, the policy-making authority of an individual should not be confused with the authority to exercise discretion. The Sixth Circuit has explained that the "authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." Feliciano v. City of Cleveland, 988 F.2d 649, 655 (6th Cir. 1993). The ability of an official to make final policy comes from "customs or legislative enactments, or such authority can be delegated to them by other officials who have final policymaking authority." Id. To determine whether an official has final policymaking authority, courts look to state law, such as "statutes, ordinances, and regulations, and less formal sources of law such as local practice and custom." Id.

Generally, courts have held that the failure by the plaintiff to introduce evidence of the policy-making power of a decision maker is fatal to a claim for municipal liability. See, e.g.,

14

Wooten v. Logan, 92 F. App'x 143, 146-147 (6th Cir. 2004) (holding, in part, that county was not liable for police chief's rape of plaintiff because plaintiff had failed to demonstrate that the police chief "was acting in a policymaking capacity"); Miller v. Calhoun Cnty., 408 F.3d 803, 814-815 (6th Cir. 2005) (holding that plaintiff had failed to introduce evidence that a prison employee had been delegated policymaking authority regarding the medical care of plaintiff's decedent). However, evidence showing a delegation by a policymaker to a lower official, such as a police investigator, can render a policy decision by that lower-ranking official final, if those decisions are unreviewable.   Monistere v. City of Memphis, 115 F. App'x 845, 852-853 (6th Cir. 2004) (holding that police investigator had been delegated unreviewable authority that amounted to custom or policy where "Executive Commander" testified that investigators were delegated authority on how to run investigations).

Applying these authorities to Plaintiff's Monell claim against Canton, the record developed fails to disclose any unconstitutional policy attributable to Canton for several reasons.

Plaintiff's most glaring deficiency is that there is no evidence regarding how CPD treated other victims of police assaults.   The only evidence presented by Plaintiff of an improperly treated victim pertained to Katie herself.   There was no evidence of any other case in which a victim of a police assailant was allegedly subjected to adverse or different treatment.   In the absence of such evidence, Plaintiff has not met her burden to show any support for her allegation that Canton had a policy to discriminate against persons victimized by police assailants, as a distinct class.[9]

_____

[9] The absence of evidence of such a policy of discrimination is made stark by the written policy adopted by Canton, which demonstrates a sensitivity to the plight of domestic violence victims.   It states that officers, in making a probable cause determination, should not consider the occupation of a domestic violence victim or the occupation of a domestic violence victim's assailant.   DIO Policy at 9.   Officers should disregard the "wishes of either party concerning arrest or

The critical nature of such evidence is illustrated in <u>Hakken v. Washtenaw County</u>, 901 F. Supp. 1245 (E.D. Mich. 1995), where the plaintiff alleged that a county sheriff's department had a policy of treating domestic assault cases less seriously than nondomestic assault cases. The district court held that "Plaintiff's version of events regarding her own situation would not be sufficient to evidence different treatment." <u>Id.</u> at 1254. And the court denied summary judgment to the defendant only on the plaintiff's promise to present, at a later date, "statistical data and a comparative study" to demonstrate a policy of differential treatment. <u>Id.</u>; <u>see also</u> <u>Watson v. City of Kansas City</u>, 857 F.2d 690, 695 (10th Cir. 1988) ("Normally, a plaintiff must point to facts outside the plaintiff's own case to support the allegation of an unconstitutional municipal policy.").[10]

In our case, there is neither anecdotal evidence nor statistical data beyond Katie's case to establish a triable issue that Canton has a policy of differential treatment based on the assailant's affiliation with law enforcement. Thus, Plaintiff has failed to establish a policy, as required under § 1983.[11]

---

prosecution." <u>Id.</u> The policy provides that if a suspect cannot be located within a reasonable time, "a warrant should be sought, in accordance with departmental and prosecutorial policy." <u>Id.</u> Plaintiff offers no evidence to show that this written policy was ignored on any occasion beyond Katie's encounter with CPD.

[10] Aside from anecdotal evidence or statistical data, a policy of different treatment may also be established through the effective admissions of a defendant. <u>See, e.g.</u>, <u>Cellini v. City of Sterling Heights</u>, 856 F. Supp. 1215, 1221 (E.D. Mich. 1994) (three police officers admitted that their department had a policy of not prosecuting misdemeanor domestic assaults that did not occur in an officer's presence). There is no such testimony in our case.

[11] The Court's conclusion that evidence pertaining solely to Katie fails to establish a Canton policy of differential treatment has no bearing on Plaintiff's claims against Falk and Schultz. Plaintiff has presented evidence that the officers' actions were a significant departure from Canton's written policy regarding domestic violence complaints – CPD's DIO policy – which might support the inference that they discriminated against Katie based on the law-enforcement affiliation of her assailant. <u>See</u> <u>Smith v. Ross</u>, 482 F.2d 33, 36-37 (6th Cir. 1973) (explaining that "a law

16

Plaintiff strains to find a CPD "policy" that is not limited to Katie's case. She points to an alleged policy to notify other law enforcement agencies when one of their employees is the subject of a domestic violence complaint. This argument is based on the testimony of Deputy Chief Kerr, who confirmed that CPD officers – sometimes – notified other law enforcement agencies that CPD was conducting an investigation of the other agency's officer. But Kerr's testimony does not reflect that this was, by any means, a regular practice:

> Q. If, as you say, you or the Canton Police Department or Canton police officers just take a report, in those circumstances, are the law enforcement agencies by which the suspect is employed routinely notified?
> A. Well, routinely, I guess I can't say for sure if that's a routine procedure or not. It's not a procedure in our established written procedures. So if it's a routine practice, I can't say if it would be in every situation.
> Q. But it is done commonly; is that a fair statement?
> A. It does happen. I'll say it does happen.

Kerr Dep. at 47-48 (Dkt. 106-8).

---

enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly, and thereby denies equal protection" of the law); Bartalone v. Berrien Cnty., 643 F. Supp. 574, 576-577 (W.D. Mich. 1986) (holding that plaintiff had stated equal protection claim against officer who allegedly refused to protect wife from abuse by husband based on the marital relationship between the victim and assailant); see also Estate of Macias v. Ihde, 219 F.3d 1018, 1028 (9th Cir. 2000) (holding that deputy sheriff could be held liable on equal protection theory alleging that plaintiff was denied police protection because sheriff intended to discriminate against her on the basis of her status as a domestic violence victim). Specifically, Plaintiff asserts that Falk discriminated against Katie (i) by refusing to help her obtain property from her home unless she provided her name so that he could file an official report and (ii) by not seeking the arrest of Ed, even though Katie's injury was evidence that a crime had been committed. Pl.'s Resp. at 20. Plaintiff also argues that Schultz discriminated against Katie by (i) failing to attempt to arrest Ed, or seek a warrant for his arrest, (ii) issuing the LEIN notice, and (iii) failing to question Ed when he spoke to Ed on the phone. Id. at 21. Plaintiff also argues that prosecution of Ed was avoided, in part, due to Katie's reluctance, even though Canton's written policy was that the victim's preferences are to be ignored. Id. These actions might support an inference of discriminatory intent by the officers. While this evidence fails to establish a Canton policy of differential treatment, it may well support the claims that the individual officers acted unconstitutionally. The Court, however, makes no ruling on this issue because Defendants did not move for summary judgment on this issue.

17

A "custom" or "policy" must represent a regularly occurring event.   Gregory v. Shelby Cnty., 220 F.3d 433, 442 (6th Cir. 2000) (holding that deviations from policy "on more than one occasion" did not "establish that the practice was so widespread as to have the force of law"); Adickes v. S. H. Kress & Co., 398 U.S. 144, 167 (1970) (stating that a custom or usage "must have the force of law by virtue of the persistent practices of state officials") (emphasis added).   The regularity of the policy or custom, as adopted by its officials, must be "so permanent and well settled" as to have "the force of law."   Monell, 436 U.S. at 691 (quotation marks omitted).

When practices are not well-settled as to have the force of law, courts have rejected Monell claims.   An instructive case is Gregory v. Shelby County.   In Gregory, the plaintiff alleged that prison guards failed to close cell doors regularly, contrary to a written prison policy.   Gregory, 220 F.3d at 442.   Because the cell doors were not closed on a particular day, the plaintiff's decedent, a prisoner, was beaten by other prisoners who were able to come into his cell.   Id. at 438.   The plaintiff asserted a Monell claim, arguing that the deviations from the written policy established a custom or usage sufficient for municipal liability.   The Sixth Circuit rejected this argument.   Although the record indicated that the prison guards deviated from the written policy on occasion, the court held that

> "[w]hile any rational trier of fact could find that the written policy was not followed on more than one occasion, Appellant has wholly failed to point to evidence in the record suggesting that this lapse of compliance with the written policy was so well settled as to constitute a custom thereby attaching [municipal] liability."

Id. at 442.

In this case, like in Gregory, Plaintiff claims that there is an unwritten policy to depart from an unobjectionable written policy.   Here, the claim is that CPD notifies another law enforcement agency when that agency's personnel is under investigation, even though the written policy forbids

18

taking into account the assailant's occupation.   But the evidence of the alleged unwritten policy of notification rests on the slim reed of Kerr's testimony that notification "does happen."   This is hardly sufficient to merit characterization as a policy.   Like the plaintiff in <u>Gregory</u>, Plaintiff "has wholly failed to point to evidence in the record suggesting that this lapse of compliance with the written policy was so well settled as to constitute a custom . . . ."   <u>Id.</u>

In any event, the notification practice, even if it amounted to a policy, would satisfy the "rational-basis" test.   "In a case such as this, where no suspect class or fundamental right is implicated," courts apply "the rational-basis test and sustain the government action in question unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government's actions were irrational."   <u>Sadie v. City of Cleveland</u>, 718 F.3d 596, 601 (6th Cir. 2013).

The Court agrees with Canton that the notification of other law enforcement agencies that an officer of that agency is under investigation in Canton is rationally related to the purpose of determining whether that particular officer is fit to serve.   Defs.' Mot. at 16-17.   And the Court rejects Plaintiff's argument that the notification practice was too attenuated for its goal of public safety.   Pl.'s Resp. at 29-31.   Calling another law enforcement agency was done with the expectation that the other law enforcement agency would intervene in some way.   Kerr Dep. at 48.   In this case, for example, CPD contacted DPD so as to (i) ascertain Ed's whereabouts, (ii) determine Ed's mental state, and (iii) inform DPD that it had a potential workplace issue involving three of its officers.   These reasons cogently supply a rational basis for notification.   <u>Nordlinger v. Hahn</u>, 505 U.S. 1, 11 (1992) ("[T]he Equal Protection Clause is satisfied as long as there is a

plausible policy reason for the classification . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." ).

Plaintiff tries to characterize the notification practice as a subterfuge to refer cases to another police agency and close Canton's own investigation. That, indeed, may have occurred here, as Canton's own counsel appears to concede that the Canton investigation was closed without explanation.[12] However, the only possible case of a "pass-off" to another law enforcement agency drawn to this Court's attention is Katie's case; the record lacks evidence of Canton delegating and closing domestic violence cases as a matter of policy.

What Plaintiff is left with to establish her case against Canton are the alleged misdeeds of individual officers in Katie's case. But there is no evidence adduced that would allow their acts to constitute the policy of Canton, within the meaning of § 1983, because there is no evidence that the individual officers had "final and unreviewable" policy-making authority. See Feliciano, 988 F.2d at 655 ("Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials."). At most, CPD's officers had the "authority to exercise discretion while performing particular functions," such as investigating domestic violence cases. Id. But there is no evidence that officers, such as Falk and Schultz, had any authority to make decisions that were "final and unreviewable" and "not constrained by the official policies of superior officials." Id.

---

[12] Defendants state that after Schultz had removed the LEIN notice, CPD "considered the matter closed." Defs.' Mot. at 2. Further, "Canton considered the matter, if not closed, at least in the hands of the Detroit Police Department, Ed Williams' employer." Id. at 16.

For all of the above reasons, the Court finds that Plaintiff has failed to raise a triable issue of fact that Canton had a policy or custom of treating domestic violence victims differently, in violation of the equal protection guaranty of the Fourteenth Amendment.[13]   Consequently, Canton is entitled to summary judgment in its favor on Plaintiff's claims against it.

### B.   The Equal Protection Claims Asserted Against Falk and Schultz

With regard to the equal protection claims brought under § 1983 against Falk and Schultz, First Am. Compl. ¶¶ 61-65, the officers maintain that they should enjoy qualified immunity "for the due process claims."   Defs.' Mot. at 23-24.   Falk and Schultz assert that, even if the Court finds a special relationship between them and Katie, the conduct of the officers does not shock the conscience to support a denial of her substantive due process rights and Plaintiff has not identified a "clearly established" constitutional right.   Id. at 25.   In response, Plaintiff argues that Falk and Schultz raise qualified immunity only with respect to due process claims, which are not in the complaint.   Pl.'s Resp. at 37.   Accordingly, Plaintiff requests that the Court deny the officers qualified immunity for her equal protection claims.   Id.

---

[13] Plaintiff advances an undeveloped argument that Canton failed to offer Katie any victim assistance, support services, referrals, or a written notice, as required by Mich. Comp. Laws § 764.15c.   Plaintiff, however, presents no evidence of any Canton policy regarding this alleged failure.

Plaintiff also contends that the "series of acts and omissions on the part of the defendant police officers and police department" in handling the investigation into Ed "can give rise to 'a pattern that evidences deliberate indifference.'"   Pl.'s Resp. at 26 (quoting Thurman v. Tarrington, 595 F. Supp. 1521 (D. Conn. 1984)).   This argument is also undeveloped and unpersuasive.   First, Thurman addressed deliberate indifference by police to domestic violence complaints voiced by the same victim over eight months; in our case, there is only one complaint on a single day. Second, the Sixth Circuit has not adopted the Thurman holding, nor is the Court aware of any other court that has held that "deliberate indifference" by police to a single victim's complaints is sufficient to establish a policy of disparate treatment.   See Watson v. City of Kansas City, 857 F.2d 690, 696 (10th Cir. 1988) ("We doubt whether evidence of deliberate indifference in the plaintiff's case alone would be sufficient evidence of different treatment.") (emphasis in original).

Despite Falk and Schultz pleading qualified immunity in their answer, Defs.' Answer ¶ 6 (Dkt. 69), and arguing qualified immunity in the instant motion, the Court agrees with Plaintiff for the following reasons.   In the instant motion, Falk and Schultz argue that they cannot be held liable for Plaintiff's "due process" claims.   Defs.' Mot. at 23-25.   As Plaintiff notes, the motion utterly fails to address the claims for equal protection violations.   Even after pointing out this deficiency in Plaintiff's response brief, Falk and Schultz have no rejoinder in their reply brief.

When presented with a similar situation, the Sixth Circuit has stated that the failure to properly and timely present qualified immunity constitutes waiver of the defense:

> We need not address [the defendants' qualified immunity argument], however, because the defendants did not raise the affirmative defense of qualified immunity in their motion for summary judgment.   Although the defendants preserved the defense in their first responsive pleading and in their answer to [the plaintiff's] complaint, they did not pursue this argument before the district court in the motion for summary judgment that they filed after the case was remanded.   The Seventh Circuit has explained that, even if a defendant has "raised" the affirmative defense in a responsive pleading, "the defense of qualified immunity may be deemed as waived if not properly and timely presented before the district court."   Walsh v. Mellas, 837 F.2d 789, 799 (7th Cir. 1988).   "[T]he cases holding that an omission of this character constitutes a waiver of the right to present that issue on appeal are legion."   Id. at 799-800 ("The mere fact that an obscure reference to [an affirmative defense] is contained in one of the defendants' pleadings does not suffice to preserve that issue for appeal.").   We find this reasoning persuasive.   See J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co., 936 F.2d 1474, 1488 (6th Cir. 1991) ("Issues not presented to the district court but raised for the first time on appeal are not properly before the court.").   We will not, therefore, address the defendants' argument that they have qualified immunity from [the plaintiff's] claim.

Brown v. Crowley, 312 F.3d 782, 787-788 (6th Cir. 2002).   However, the failure to properly and timely present qualified immunity does not bar assertion of the defense for later stages of litigation, such as trial.   English v. Dyke, 23 F.3d 1086, 1090 (6th Cir. 1994) (A waiver of a qualified immunity "need not waive the defense for all purposes but would generally only waive

the defense for the stage at which the defense should have been asserted.").

Falk and Schultz have "'not properly and timely presented'" the defense of qualified immunity with respect to the equal protection claims. Thus Falk and Schultz have waived the right to assert this defense at this stage of the proceedings. <u>Brown</u>, 312 F.3d at 788. Accordingly, the Court denies the motion without prejudice with respect to the equal protection claims asserted against Falk and Schultz.[14]

## V. CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Defendants' motion. Summary judgment is awarded to Canton, but denied, without prejudice, to Falk and Schultz. The Court also denies Defendants' motion for judgment on the pleadings (Dkt. 81) as moot because the motion only asserted defenses with respect to Canton and not as to Falk or Schultz.

SO ORDERED.


Dated: October 9, 2013                          s/Mark A. Goldsmith_____
        Flint, Michigan                         MARK A. GOLDSMITH
                                                United States District Judge

---

[14] In a belated attempt to cure the deficiencies in their motion, Falk and Schultz filed a supplemental brief raising new arguments regarding qualified immunity without leave of court. <u>See</u> Defs.' Supp. Br. (Dkt. 118). For numerous reasons, the Court struck the brief. 10/9/2013 Order (Dkt. 119). However, as explained in the body of that Order, the Court will discuss with the parties at the forthcoming status conference whether Falk and Schultz should be granted leave to file a new and properly briefed motion based on qualified immunity.

<u>**CERTIFICATE OF SERVICE**</u>

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 9, 2013.

<div style="margin-left: 40%;">

s/Deborah J. Goltz
DEBORAH J. GOLTZ
Case Manager

</div>