UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBORAH RYAN,

        Plaintiff,

                                        Case No. 11-CV-10900

v.

                                        HON. MARK A. GOLDSMITH

CITY OF DETROIT, et al.,

        Defendants.

_____/

## OPINION AND ORDER GRANTING THE DETROIT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 111)

### I. INTRODUCTION

This is a civil rights case brought pursuant to 42 U.S.C. § 1983. Plaintiff Deborah Ryan, in her individual capacity and as the representative of the estate of her daughter, Patricia "Katie" Williams, filed suit alleging that Defendants City of Detroit, Detroit police officers Dwane Blackmon and Barbara Kozloff, City of Canton, and Canton police officers Adam Falk and Mark Schultz failed to respond properly to a report made to the Canton Police Department ("CPD") of domestic violence committed by Ed Williams upon his wife, Katie Williams. Plaintiff alleges that Defendants' failure enabled Ed to murder Katie, both of whom were Detroit police officers. In her section 1983 claims alleging substantive due-process violations by Detroit police officers Blackmon and Kozloff, and the City of Detroit (collectively, for purposes of this opinion, the "Detroit Defendants"), Plaintiff argues that Defendants increased the risk of harm to Katie by taking actions that kept Ed at liberty and ultimately enabled him to kill her.

The Detroit Defendants have moved for summary judgment (Dkt. 111). As explained fully below, the Court grants the motion because there is no genuine issue of material fact that

Kozloff and Blackmon did not violate Katie's rights under the Fourteenth Amendment to the U.S. Constitution, and, therefore, they are shielded by qualified immunity. Because there was no constitutional violation by the individual officers, the City of Detroit cannot be held liable and is entitled to summary judgment in its favor.

## II. BACKGROUND

The Court has already addressed the facts of this case, but with a focus on the City of Canton, Adam Falk, and Mark Schultz (collectively, the "Canton Defendants"). See Ryan v. City of Detroit, 977 F. Supp. 2d 738 (E.D. Mich. 2013). The following facts reiterate the events that occurred between September 19, 2009 and September 22, 2009 relating to Ed and Katie, but with a focus on then-Lieutenant Dwane Blackmon, Sergeant Barabara Kozloff, and the City of Detroit.

### A. Facts Pertaining to the Detroit Defendants

Ed Williams, a Detroit Police Department ("DPD") homicide detective, was married to Katie Williams, a DPD academy instructor. By 2009, the couple had been married for approximately three years and owned a home on Wall Street in Canton, Michigan. 9/20/09 Falk Report at 1 (Dkt. 138-3). Ed and Katie had marital difficulties, however, and, by September 2009, they had not been living together for two months. Id.

At about 9:45 p.m. on the evening of Saturday, September 19, 2009, Ed came to the Wall Street home and found Katie talking to her boyfriend, Clifford Lee, on the phone. Video Tr. at 6-7 (Dkt. 138-5). An argument ensued, which culminated in Ed pushing Katie to the ground; Katie sustained a cut on her right cheek. Id. Shortly after midnight, Katie and Lee arrived at the CPD headquarters and requested a police escort to accompany Katie back home. Falk Report at 1.

Officer Adam Falk was on duty at the CPD headquarters and interviewed Katie. Falk Dep. at 10. Katie described the domestic-violence episode with her husband, but refused to provide her name or Ed's name. Id. at 14–17. Katie told Falk that she and her husband were both Detroit police officers and that she did not want Ed to lose his job. Video Tr. at 5, 8.

Falk informed Katie that all he could do was write a report and let the prosecutor make the determination whether Ed would be charged. Id. at 6. Falk said that he would write a report, but would not seek the arrest of Ed based on the information Katie gave him. Id.at 13. Katie then left the CPD headquarters with Lee. Falk Dep. at 17. Just before she left the police headquarters, Falk asked Katie, "Do you still want anybody to go over to the house?" Katie responded, "No." Video Tr. at 18.

Katie returned to the Wall Street home the morning of September 20, accompanied by Plaintiff, her mother. Deborah Ryan Dep. at 60-65 (Dkt. 138-6). Katie entered the home unaware that Ed was there. Id. According to Plaintiff, the women had an altercation with Ed, which involved yelling and a scuffle. Id. During this incident, Ed was holding a handgun and was intoxicated. Id. Plaintiff called the Canton police for help, but Ed had fled by the time the police arrived. Id. at 72. The police also found that Ed had left a note, which one of the responding officers, Lieutenant Mark Schultz, considered to be a "suicide note."[1] Mark Schultz Dep. at 111 (111-3). Shortly after Ed fled, Schultz issued a notice through the Law Enforcement Information Network ("LEIN") regarding Ed.[2] LEIN Worksheet (Dkt. 138-8).

---

[1] The note stated, "I[,] Edward G. Williams II of sound mind (a little pissed off though), hereby leave all worldly possessions to my mother, Wanda Williams. This is to include all life insurance policies and bank accounts."

[2] The notice stated, "DPD officer, intox, no known veh reg, after domestic situation left a suicide note, poss left home with a handgun, if any contact use caution and call Canton PD." LEIN Worksheet (Dkt. 138-8).

After returning to CPD that morning, Schultz contacted DPD to notify it of the incident between two of its officers.  Schultz Dep. at 50-53, 57.  The transcript of Schultz's initial call to Sergeant Martel of DPD reveals that Schultz wanted DPD apprised of the situation so that it would "get a hold of" Ed.  Call Tr. at 5 (Dkt. 138-12).  Schultz explained to Martel that he did not think the domestic-violence incident would get a full investigation because (i) CPD did not have enough information, (ii) initially, Katie did not provide her name, and (iii) Falk had only written a civil report.  Id. at 11.  Schultz also told Martel that he was concerned that there may be a "workplace issue," because Schultz did not know whether Ed knew the identity of Katie's boyfriend, Lee, who was also a DPD officer.  Id. at 12-14.

In deposition, Schultz testified that if DPD wanted to do an internal investigation, CPD would have provided DPD with information.  Id. at 59. Schultz also stated that he had hoped that DPD could get a hold of Ed to assess his "mental state."  Id.

A few minutes after speaking with Schultz, Martel called his own supervisor, Dwane Blackmon, and reported the events that had occurred between Ed and Katie.  Blackmon Dep. at 20-29 (Dkt. 139-1); Call Tr. at 10.  Martel then called Schultz back and told him that he had been instructed by DPD's Internal Affairs ("IA") division to have all the information that CPD wanted to submit sent to IA and not Homicide, his and Ed's division.  Call Tr. at 10-15.  However, the record does not disclose when Martel received the instruction from IA that it would handle the investigation, nor does it disclose who specifically from IA gave the instruction.

CPD Officer Michael Steckel, an officer who assisted Schultz on September 20, 2009, also testified about CPD contacting DPD because he also called Martel.  Steckel considered Ed's conduct to be a "mental situation" because of the drinking, the gun, and the note.  Steckel Dep. at 24 (Dkt. 139-12).   Steckel later explained to Martel that Ed could either come to CPD or his

4

"supervisor's office at [DPD] and we would make our decision based on what they had to say about if it was good enough to remove him from LEIN." Id.

Throughout the day, Schultz had called Ed in the hopes of speaking with him, to no avail. Schultz Dep. at 59.  Then, at a little after 6:00 p.m. that Sunday, while Steckel was on the phone with Martel, Schultz had a brief phone conversation with Ed.  Call Tr. at 17; Schultz Dep. at 82, 86.  Schultz told Ed that he knew Ed had left the note.  Ed responded that the note did not mean anything.  Schultz Dep. at 83.  Schultz also told Ed that he had entered the LEIN notice, listing him as a "missing person endangered." Id.  Schultz said that he would not remove the notice until Ed came to see Schultz or went to his supervisor at DPD. Id.  Ed said that he was closer to Detroit, so Schultz told Ed to have his supervisor call him when he got to DPD. Id.

At some point prior to Ed's arrival at DPD that Sunday evening, Martel called his colleague Kozloff, and told her that Ed had been involved in an incident, perhaps domestic, at his house in Canton, and that CPD had entered Ed into LEIN as an "endangered missing." Kozloff Dep. at 38-40 (Dkt. 138-16).  Kozloff did not remember whether her division, Homicide, was supposed to stay out of the matter because IA would handle it, but she did know CPD documents were to be faxed to IA. Id. at 50-52.

Kozloff testified that, prior to meeting Ed, she had a phone call with Schultz.  Kozloff Dep. at 45-46.  Kozloff also testified that, from her conversation with Schultz, there was no probable cause to arrest Ed. Id.  Schultz had apprised Kozloff of the basic facts of the morning incident in Canton.  Schultz Dep. at 77-78.

At some point on that Sunday, Blackmon spoke with Kozloff.  According to Kozloff, Blackmon encouraged her to see Ed, see how he was doing, see if he was "okay and offer him personal affairs." 1/28/10 Kozloff Statement at 6-7 (Dkt. 138-15).  While Kozloff was talking to

Blackmon, Ed called Kozloff on her cell phone.  Kozloff Dep. at 37.  Kozloff told Ed that she needed to see him because of the incident in Canton, but Ed told Kozloff to lie and state that she had seen him.  Id. at 66.  Kozloff testified that she refused to lie for Ed.  Id. at 67.  Ed told Kozloff that he was "too far away" to come to DPD.  Id. at 68.  In fact, however, Ed was nearby and ultimately agreed to come in.  Id. at 69.  Kozloff then notified Blackmon of her telephone conversation with Ed, and Blackmon urged Kozloff to see if Ed was "O.K."  DPD Report at 19.

Ed met with Kozloff on Sunday evening, September 20.  Kozloff Dep. at 75.  Ed told Kozloff of his marital strife, relating the argument with Katie that morning at the Wall Street home.  Id. at 78.  Kozloff also testified that Ed stated that when he heard police sirens, he left the home.  Id. at 79.  Kozloff did not inquire further on this point because she claims that she had not been apprised of any other facts by Blackmon, Martel, or Schultz.  Id. at 41, 45, 49, 61-62.  Kozloff asked Ed about the note he had left, and Ed told her that he left it because he feared that Katie would shoot him.  Id. at 82.  Kozloff did not take this explanation seriously.  Id.  Kozloff also did not inquire into or check the LEIN notice.  Id. at 102-103.

After meeting with Ed, Kozloff first called Blackmon and let him know that she had met Ed.  See id. at 38.  She then called Schultz at approximately 6:30 p.m. and told him that "all is well" with Ed.  Schultz Dep. at 87-88.  Relying on Kozloff's representation that "all is well," Schultz removed the LEIN notice.  Id. at 92.  The timing of the LEIN notice's removal is unclear from the record.

The next day, Monday, September 21, 2009, Ed and Katie agreed to meet the following morning in the Canton public library parking lot.  DPD Report at 3 (Dkt. 138-2).  On September 22, 2009, Ed and Katie met as planned at approximately 8:00 a.m., and spent about an hour talking on a bench near the parking lot.  Id.  After about an hour, the couple got up from the

bench, and Ed retrieved a handgun from his car.  Id.  Ed shot and killed Katie with his handgun in the parking lot.  Id.  He then committed suicide by turning the gun on himself.  Id.  The handgun was his personal firearm, not his service firearm.  Id. at 3, 27.

### B. Procedural Background

On March 7, 2011, Plaintiff filed her original complaint (Dkt. 1). After some discovery, the Court granted Plaintiff's motion for leave to amend her complaint (Dkt. 57) to name the Canton Defendants.  The operative amended complaint (Dkt. 59) contains six claims for relief:

    i.    Count I (against City of Detroit, Kozloff, and Blackmon):  Denial of due process under 42 U.S.C. § 1983;

    ii.    Count II (against all Defendants):  Denial of equal protection under 42 U.S.C. § 1983;

    iii.    Count III (against City of Detroit):  42 U.S.C. § 1983 – Monell claim;

    iv.    Count IV (against City of Canton):  42 U.S.C. § 1983 – Monell claim;

    v.    Count V (against Kozloff and Blackmon):  Gross negligence;

    vi.    Count VI:  Wrongful death.[3]

---

[3] This count does not assert a claim against any particular Defendant, but simply recites that the action seeks relief pursuant to the Michigan Wrongful Death Act, Mich. Comp. Laws § 600.2922 et seq.  That statute states that "[w]henever the death of a person . . . shall be caused by wrongful act, neglect, or fault of another, and the act, neglect, or fault is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages, the person who . . . would have been liable, if death had not ensued, shall be liable to an action for damages[.]"  Mich. Comp. Laws. 600.2922(1). The Sixth Circuit has held that Michigan's wrongful death statute "clearly provides not that death creates a cause of action, but that death does not extinguish an otherwise valid cause of action." Frontier Ins. Co. v. Blaty, 454 F.3d 590, 599-600 (6th Cir. 2006).  Accordingly, the Sixth Circuit has held that the Michigan cause of action for wrongful death is "derivative, rather than independent, of a decedent's underlying tort action."  Kane v. Rohrbacher, 83 F.3d 804 (6th Cir. 1996); see also Ballard v. Sw. Detroit Hosp., 327 N.W.2d 370, 371 (Mich. Ct. App. 1982) (holding that "the [wrongful death] action brought by the personal representative is a derivative one, and the representative in effect stands in the shoes of the decedent").  Because the Court grants the Detroit Defendants summary judgment on

While the Court dismissed the <u>Monell</u> claim against the City of Canton, <u>see</u> 10/9/13 Op. & Order (Dkt. 120), the equal-protection claims against Officers Schultz and Falk of CPD remain pending.  Furthermore, Plaintiff has dismissed her equal-protection and gross-negligence claims against the Detroit Defendants, <u>see</u> Pl. Resp. ¶¶ 2-3 (Dkt. 138), leaving the <u>Monell</u> claim against the City of Detroit and the due-process claims against Blackmon and Kozloff to be resolved.

### III.  SUMMARY JUDGMENT STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When evaluating a summary judgment motion,

> credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  Thus, the facts and any inferences that can be drawn from those facts must be viewed in the light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

<u>Biegas v. Quickway Carriers</u>, 573 F.3d 365, 373 (6th Cir. 2009) (quotation marks and brackets omitted).

### IV.  ANALYSIS

The claims against Blackmon and Kozloff and the claim against the City of Detroit are related, yet distinct: the claims against the City of Detroit and its officers are both grounded in an alleged deprivation of due process, but the claim against the City is only viable if the claims against its officers can withstand summary judgment.  As elaborated below, the Court concludes that Plaintiff has no sustainable claim against Blackmon and Kozloff, because Plaintiff cannot meet the requirements of the "state-created danger" doctrine, which provides an exception to the

---

the underlying cause of action against them, Plaintiff is not entitled to damages under the derivative wrongful-death claim.

general rule that a state actor has no constitutional obligation to protect persons from the wrongdoing of private parties. Therefore, summary judgment must be entered in favor of all the Detroit Defendants.

### A.   The Alleged Substantive Due-Process Violations By Blackmon and Kozloff

Plaintiff pursues her action under 42 U.S.C. § 1983. To establish a cause of action under section 1983, a plaintiff must establish two elements: (i) a deprivation of a right secured by the Constitution or laws of the United States (ii) caused by a person acting under color of state law. Hunt v. Sycamore Comm. Sch., 542 F.3d 529, 534 (6th Cir. 2008). There is no dispute that Kozloff and Blackmon, as DPD officers, were acting under color of state law. Plaintiff's claims hinge on whether Katie suffered a deprivation of a right secured by the Constitution, namely her substantive due-process rights afforded by the Fourteenth Amendment.

In determining whether Blackmon and Kozloff violated Katie's substantive due-process rights under the 14th Amendment, it must be recognized that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." Id. (brackets and internal citation omitted). However, a state actor can violate the due-process clause by "creating a particular danger to [a] victim." Id.

This theory of liability is recognized as the state-created danger doctrine. Id. (citing Kallstrom v. City of Columbus, 136 F.3d 1055, 1065-1067 (6th Cir. 1998)). To establish that the state acted with the requisite culpability under this theory, a section 1983 plaintiff is required to "show that the challenged action was so 'egregious' that it can be said to be 'arbitrary in the constitutional sense.'" Ewolski v. City of Brunswick, 287 F.3d 492, 510 (6th Cir. 2002) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)). Put another way, "the Fourteenth Amendment protects only against abuse of executive power which 'shocks the conscience.'" Id.

(quoting Lewis, 523 U.S. at 846).  This is a "demanding standard for constitutional liability." Sargi v. Kent City Bd. of Educ., 70 F.3d 907, 913 (6th Cir. 1995).

Under the state-created danger doctrine, a governmental actor can be held responsible for an injury committed by a private person if

> [i] an affirmative act by the governmental actor either created or increased the risk the plaintiff would be exposed to the injurious conduct of the private person; [ii] the governmental actor's act especially endangered the plaintiff or a small class of which the plaintiff was a member; and [iii] the governmental actor had the requisite degree of culpability.

Id.

With respect to the first element — the existence of an affirmative act — courts have stated that the pertinent conduct must "directly increase the vulnerability of [a] citizen[] to danger or otherwise place [a] citizen[] in harm's way."  Ewolksi, 287 F.3d at 509 (quotation marks omitted); see also Kallstrom, 136 F.3d at 1066 ("[W]hile the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts."); Cartwright v. City of Marine City, 336 F.3d 487, 493 (6th Cir. 2003) (indicating that a "failure to act is not an affirmative act under the state-created danger theory").

Plaintiff identifies two affirmative acts by Blackmon and Kozloff that purportedly increased the danger of violence to Katie: (i) Blackmon advised/ordered Kozloff to contact Ed so that the LEIN notice would be removed; and (ii) Kozloff met with Ed and then advised Schultz that "all was well" with Ed.  Pl. Br. at 22.  Plaintiff notes that these acts were performed after Defendants had been advised by IA that DPD Homicide should "stay out" of the situation.  Id. However, the Court finds that there is no genuine issue of material fact that neither Kozloff nor Blackmon did an affirmative act that created or increased Katie's risk of injury from Ed.

In ascertaining whether a defendant's conduct was "affirmative conduct or not," courts

10

"have focused on whether the victim was safer before the state action than he was after it." Koulta v. Merciez, 477 F.3d 442, 446 (6th Cir. 2007) (quotation marks and brackets omitted). This is illustrated in Koulta, where a speeding drunk driver ran a red light and killed the driver of another vehicle. Twelve minutes prior to the accident, the drunk driver had been interviewed by police, who did not cite the driver for having an expired license plate, did not conduct any investigation into the driver's driving record, and did not administer a sobriety test. Id. at 444. The estate of the decedent filed a section 1983 action against the officers and others, alleging a substantive due-process violation. The district court denied the defendants summary judgment, but the Sixth Circuit reversed. In doing so, the court of appeals concluded there was no evidence that the police officers created or increased the risk of danger, which was that the drunk driver's "drinking and driving would injure someone." Id. at 446. The court reasoned that, while "the officers were in a position to head off the tragedy that materialized minutes later," their conduct did not affirmatively create a risk. Id. at 446-447. Therefore, the officer's conduct did not increase the danger of the driver drinking and driving — a danger that had pre-dated their arrival on the scene. Id.

Similarly, an action that only indirectly increases the risk of danger to a plaintiff is not an affirmative act. Sargi, 70 F.3d at 913 (taking seizure victim home, and not obtaining immediate medical attention for her, did not amount to an affirmative act); Bullard v. Inkster Hous. & Re-Dev. Comm'n, 126 F. App'x 718, 720 (6th Cir. 2005) (failing to provide adequate security measures for an apartment door to prevent break-ins was not an affirmative act).

Here, the Court agrees with Defendants that none of the actions Plaintiff has identified constitutes an affirmative act that directly increased the risk of danger to Katie. Defendants' actions merely returned Katie to the same level of danger that existed before Kozloff and

11

Blackmon took any action.

Plaintiff argues that Defendants' "affirmative acts" increased the risk of harm to Katie because they ultimately prompted CPD to remove Ed from LEIN, which supposedly deterred his placement in a psychiatric facility, which placement would have resulted in his suspension and surrender of his service firearm.   See Pl. Br. at 23-24.   However, this superficial analysis contains several flaws:

- CPD – not the Detroit Defendants – removed Ed from LEIN; their actions were a link down the causal chain, making plainly unreasonable any characterization of the Detroit Defendant' acts as "directly" increasing Katie's vulnerability.

- It is entirely speculative that Ed would have been committed to a psychiatric facility, and that he would have been confined for any significant period of time, and that he would not have acted on his earlier expressed assaultive intent after release.   See Culp v Rutledge, 343 F. App'x 128 (6th Cir. 2009) (affirming summary judgment for officer on section 1983 claim, who failed to arrest domestic assailant, because there was no evidence that assailant would not have made bond; assertion that his arrest would have prevented victim's murder was "unsupported speculation").

- The weapon Ed used to kill Katie was not Ed's service revolver, but his personal firearm; thus, even if Plaintiff's causal chain regarding the effects of the LEIN notice was not speculative, it does not show how Defendants' actions were linked to the weapon that Ed used to commit the homicide.

Most importantly, Plaintiff's theory fails to account for the principal factor leading to Katie's tragic demise — Ed's assaultive propensity towards his wife.   Prior to DPD's involvement, the couple had long-standing marital problems; Ed had already assaulted Katie on the night of September 19, 2009; and he had threatened her with a firearm at their house the next day.   Because the record is clear that Ed had already posed a danger to Katie, it cannot be reasonably argued that Kozloff and Blackmon increased the danger to Katie. At most, Defendants' actions returned Katie to the level of danger that existed before DPD became involved.   Like the drunk driver in Koulta who had created the risk of a fatal accident by driving intoxicated before interacting with the police, Ed had created the risk of harm to Katie prior to

12

any action by Kozloff or Blackmon.  Koulta, 477 F.3d at 446-447.

Plaintiff's substantive due-process claim must fail, because, in investigating Ed and providing information to CPD that may have prompted CPD to remove the LIEN notice, Defendants merely returned Katie to the status quo ante.  Bukowski v. City of Akron, 326 F.3d 702, 709 (6th Cir. 2003) ("[T]he act of returning someone to the same dangers that existed status quo ante does not satisfy the state-action requirement.").  Thus, Plaintiff's failure to establish the first element of the three-part state-created danger doctrine is fatal to her claim.  Culp, 343 F. App'x at 134 (holding that, because the plaintiffs could not establish an affirmative act for the state-created-danger test, the plaintiffs' section 1983 claim failed as a matter of law).  Because Plaintiff cannot establish a constitutional violation, Kozloff and Blackmon are entitled to qualified immunity.[4]

Accordingly, the Court grants summary judgment to Kozloff and Blackmon.[5]

### B.  The Monell Claim Against the City of Detroit

Defendants contend that the Monell claim against the City of Detroit should also be dismissed.  Defs. Br. 17-20.  While Defendants offer different grounds, one argument is dispositive:  The City cannot be held liable under section 1983, because the individual officers did not commit any constitutional violation.  Id. at 19.  Apparently, Plaintiff agrees, because she

---

[4] The Court will not address whether any constitutional right asserted by Plaintiff was "clearly established," given the conclusion that Plaintiff has failed to demonstrate any constitutional violation.  See Perez v. Oakland Cnty., 466 F.3d 416, 426-427 (6th Cir. 2006), cert. denied, 552 U.S. 823 (2007).

[5] Defendants also raised a causation argument in their reply brief, i.e. that the causal link between any action by Defendants and Katie's death was severed by Katie's independent decision to meet Ed on the morning that she was killed.  Defs. Reply at 5 (Dkt. 141).  The Court declines to rule on this issue, as it was not presented in the moving parties' opening brief.  See Ryan v. City of Detroit, No. 11-CV-10900, 2013 WL 6730051, at *7 n.6 (E.D. Mich. Dec. 19, 2013).

does not contest this point in her response.

Under a theory of municipality liability, "a local government may be held monetarily liable for violating federally protected rights under § 1983 only where a policy or custom of the county inflicts the injury." Peach v. Smith Cnty., Tenn., 93 F. App'x 688, 692 (6th Cir. 2004) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978)). However, a municipality "cannot be liable under § 1983 absent an underlying constitutional violation by its officers." Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 900 (6th Cir. 2004). The failure of a plaintiff to demonstrate the violation of a constitutional right means that a Monell claim fails as a matter of law. Peach, 93 F. App'x at 692; Ryan v. Hazel Park, 279 F. App'x 335, 339 (6th Cir. 2008) ("Because we find no underlying constitutional violation by the City's officers, the district court also correctly dismissed Ryan's claims against the City."); Boykin v. Van Buren Tp., 479 F.3d 444, 450 (6th Cir. 2007) ("The district court was also correct in holding, in light of its finding that there was no constitutional violation committed by Officers Hayes or Harrison, that Boykin's claim of municipal liability necessarily fails." (quotation marks omitted)).

Here, Detroit cannot be held liable under a Monell theory, because the Court has determined that Kozloff and Blackmon did not commit a constitutional violation of Katie's substantive due-process rights.

## V. CONCLUSION

For the reasons set forth above, the Court grants the Detroit Defendants' motion for summary judgment (Dkt. 111).

SO ORDERED.

Dated: March 25, 2015                    s/Mark A. Goldsmith
        Detroit, Michigan                MARK A. GOLDSMITH
                                         United States District Judge

14

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 25, 2015.

s/Carrie Haddon
Case Manager