UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBORAH RYAN, on behalf of herself
individually, and as Personal Representative
of the Estate of Patricia "Katie" Williams,

          Plaintiff,

vs.

CITY OF DETROIT, Detroit Police Sergeant
BARBARA KOZLOFF, in her individual
capacity, Detroit Police Inspector (formerly
Lieutenant) DWANE BLACKMON, in his
individual capacity; CANTON TOWNSHIP,
Canton Police Lieutenant MARK SCHULTZ, in
his individual capacity; Canton Police Officer
ADAM FALK, in his individual capacity,

          Defendants.

Case No. 11-10900
Honorable Mark A. Goldsmith
Magistrate Michael J. Hluchaniuk

**PLAINTIFF'S RESPONSE TO
DEFENDANTS SCHULTZ
AND FALK'S SECOND
RENEWED MOTION FOR
SUMMARY JUDGMENT
[Doc. #159]**

_____/

William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Miriam R. Nemeth (P76789)
Goodman & Hurwitz, P.C.
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170/Fax: (313) 567-4827
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com
mnemeth@goodmanhurwitz.com
*Attorneys for Plaintiffs*


Kathleen J. Kalahar (P60301)
Goodman Kalahar
1394 E Jefferson Ave
Detroit, MI 48207
(313) 567-6165/Fax: (313) 567-4827
kkalahar@goodmankalahar.com
*Co-Counsel for Plaintiffs*

Michael M. Muller (P38070)
City of Detroit Law Dept.
660 Woodward Ave., Suite 1650
Detroit, MI 48226
(313) 237-5052/Fax: (313) 224-5505
mullm@detroitmi.gov
*Attorneys for Defendants City of Detroit, Kozloff,
and Blackmon*

James R. Acho (P672175)
Cummings, McClorey, Davis, & Acho, PLC
33900 Schoolcraft
Livonia, MI 48150
(734) 261-2400/Fax: (734) 261-4510
jacho@cmda-law.com
*Attorneys for Defendants Canton Township,
Schultz, and Falk*

_____/

NOW COMES Plaintiff Deborah Ryan, by and through her attorneys, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and in Response to Defendants' Second Renewed Motion for Summary Judgment on Behalf of Lieutenant Schultz and Officer Falk [Doc. #159], states as follows:

1.      Plaintiff admits Paragraph 1 of Defendants' Motion.

2.      Plaintiff admits Paragraph 2 of Defendants' Motion.

3.      Plaintiff admits Paragraph 3 of Defendants' Motion.

4.      Plaintiff admits Paragraph 4 of Defendants' Motion.

5.      Plaintiff admits Paragraph 5 of Defendants' Motion.

6.      Plaintiff admits Paragraph 6 of Defendants' Motion.

7.      Plaintiff admits Paragraph 7 of Defendants' Motion.

8.      Plaintiff admits Paragraph 8 of Defendants' Motion.

9.      Plaintiff admits Paragraph 9 of Defendants' Motion.

10.    Plaintiff denies Paragraph 10 of Defendants' Motion. As discussed in Plaintiff's brief below, a reasonable jury could find that Defendants Falk and Schultz violated Katie Williams' right to equal protection.

11.    Plaintiff denies Paragraph 11 of Defendants' Motion. As discussed in Plaintiff's brief below, there is evidence that Defendants Falk and Schultz intentionally treated Katie differently than other domestic violence victims on the basis that her assailant was a police officer.

12.     Plaintiff denies Paragraph 12 of Defendants' Motion. As discussed in Plaintiff's brief, there is evidence that similarly situated domestic violence victims whose assailants were civilians were treated more favorably than Katie Williams.

13.     Plaintiff denies Paragraph 13 of Defendants' Motion. As discussed in Plaintiff's brief below, a reasonable jury could conclude that Defendants' basis for treating Katie differently lacked a rational basis.

14.     Plaintiff denies Paragraph 14 of Defendants' Motion. As discussed in Plaintiff's brief, Katie Williams' right to equal protection was clearly established.

15.     Plaintiff denies Paragraph 15 of Defendants' Motion. As discussed in Plaintiff's brief below, Defendants are not entitled to qualified immunity.

16.     Plaintiff admits Paragraph 16 of Defendants' Motion.

WHEREFORE, for the reasons outlined above and in her *Response Brief* below, Plaintiff respectfully requests that this Honorable Court deny Defendants' Second Renewed Motion for Summary Judgment.

Respectfully submitted,

GOODMAN & HURWITZ, P.C.                  -and-
*By: Kathryn Bruner James*               GOODMAN KALAHAR
Kathryn Bruner James (P71374)            By:  Kathleen J. Kalahar (P60301)
1394 E. Jefferson Ave.                   1394 E Jefferson Ave
Detroit, MI 48207                        Detroit, MI  48207
(313) 567-6170/Fax: (313) 567-4827       (313) 567-6165/Fax: (313) 567-4827
kjames@goodmanhurwitz.com                kkalahar@goodmankalahar.com
*Attorneys for Plaintiffs*               *Co-Counsel for Plaintiffs*

Dated: May 18, 2015

2

**PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANTS'
SECOND RENEWED MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ............................................................. iii

MOST APPROPRIATE AUTHORITY ................................................................. iv

TABLE OF AUTHORITIES ................................................................................. v

COUNTER-STATEMENT OF MATERIAL FACTS ........................................... 3

STATEMENT OF ADDITIONAL MATERIAL FACTS ...................................... 5

   Relevant Events of September 19, 2009 through September 22, 2009 ................ 5

   CPD Domestic Violence Policies and Michigan Statutory Requirements .......... 11

   Similarly Situated Domestic Violence Victims of Civilian Assailants .............. 13

I.      INTRODUCTION ....................................................................................... 15

II.    APPLICABLE LAW .................................................................................. 16

      A. SUMMARY JUDGMENT .................................................................... 16

      B. QUALIFIED IMMUNITY .................................................................... 16

      C. EQUAL PROTECTION ......................................................................... 17

III.   ARGUMENT .............................................................................................. 18

      A. Katie was a Member of an "Identifiable Group" ...................................... 18

      B. Defendants Treated Katie Differently than Other Similarly Situated
         Victims Whose Assailants were not Police Officers ................................ 19

         1.   Falk Treated Katie Differently Than Other Victims ...................... 19

         2.   Schultz Treated Katie Differently Than Other Victims .................. 21

         3.   Arrest of DPD Officer in August 2011 ........................................... 23

      C. Defendants' Discriminatory Treatment Was Intentional ......................... 25

      D. Defendants Lacked a Rational Basis for Treating Katie Differently ....... 26

      E. Katie's Right to Equal Protection was Clearly Established .................... 28

IV.   CONCLUSION ........................................................................................... 30

CERTIFICATE OF SERVICE ....................................................................i

LOCAL RULE CERTIFICATION ............................................................i

EXHIBIT LIST ..................................................................................ii-iii

## <u>STATEMENT OF ISSUES PRESENTED</u>

Whether there is evidence that Katie Williams was a member of an "identifiable group" of victims of domestic violence whose assailants were police officers.

      Plaintiff's answer: Yes.


Whether there is evidence of differential treatment showing that other domestic violence victims whose assailants were not police officers were treated more favorably than Katie.

      Plaintiff's answer: Yes.


Whether there is evidence that Defendants' disparate treatment was intentional.

      Plaintiff's answer: Yes.


Whether Defendants lacked any rational basis for treating Katie differently.

      Plaintiff's answer: Yes.


Whether the law of equal protection was clearly established prior to the underlying events.

      Plaintiff's answer: Yes.


Whether Defendants violated Katie's right to equal protection.

      Plaintiff's answer: Yes.


Whether qualified immunity should be denied in this matter.

      Plaintiff's answer: Yes.

## <u>MOST APPROPRIATE AUTHORITY</u>

*Cellini v. City of Sterling Heights*, 856 F. Supp. 1215 (E.D. Mich. 1994)

*Loesel v. City of Frankenmuth*, 692 F.3d 452 (6th Cir. 2012)

*Taylor Acquisitions v. City of Taylor*, 313 Fed. Appx. 826 (6th Cir. 2009)

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)............................................16

*Barrett v. Stubenville City Schs.*, 388 F.3d 967 (6th Cir. 2004) ..............................28

*Bartalone v. Cnty. of Berrien*, 643 F. Supp. 574 (W.D. Mich. 1986) ....................30

*Biegas v. Quickway Carriers*, 573 F.3d 365 (6th Cir. 2009)...................................16

*Burella v. City of Philadelphia*, 501 F.3d 134 (3rd Cir. 2007)...............................23

*Cellini v. City of Sterling Heights*, 856 F. Supp. 1215 (E.D. Mich. 1994)..18, 26, 30

*Celotex v. Catrett*, 477 U.S. 317 (1986) ................................................................16

*City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S. 432 (1985) .....17

*Craigmiles v. Files*, 312 F.3d 220 (6th Cir. 2002)...................................................27

*Davis v. Prison Health Srvs.*, 679 F.3d 433 (6th Cir. 2012)...................................18

*Dell v. Straub*, 194 F.Supp.2d 629 (E.D. Mich. Feb. 28, 2002) ........................14, 21

*Engquist v. Ore. Dep't of Agr.*, 553 U.S. 591 (2008) ..............................................18

*Estate of Macias v. Ihde*, 219 F.3d 1018 (9th Cir. 2000) ........................................29

*Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003) ...............................................17, 28

*Gibson v. Jackson*, 2007 WL 3227579 (E.D. Mich. Oct. 31, 2007)........................22

*Grawey v. Drury*, 567 F.3d 302 (6th Cir. 2009) ..............................................17, 28

*Gregory v. Louisville*, 444 F.3d 725 (6th Cir. 2006) ..............................................17

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) .....................................................17, 28

*Hope v. Pelzer*, 536 U.S. 730 (2002) ......................................................................29

*Kijowski v. Niles*, 372 Fed.Appx. 595 (6th Cir. 2010)..........................................29

*Landis v. Galarneau*, 2010 WL 458143 (E.D. Mich. Feb. 3, 2010).......................29

*Loesel v. City of Frankenmuth*, 692 F.3d 452 (6th Cir. 2012)....................18, 20, 26

*McCleskey v. Kemp*, 481 U.S. 279 (1987) ..............................................................25

*Ohio Civil Serv. Employees Ass'n v. Seiter*, 858 F.2d 1171 (6th Cir. 1988)..........28

*People c. McLean*, 2011 WL 4056389 (Mich. App. 2011) ......................................12

*Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000)...................................................18

*Sadie v. City of Cleveland*, 718 F.3d 596 (6th Cir. 2013)........................................26

*Saucier v. Katz*, 533 U.S. 194 (2001) .............................................................17, 28

*Smith v. Ross*, 482 F. 2nd 33 (6th Cir. 1973) ........................................................29

*Taylor Acquisitions v. City of Taylor*, 313 Fed. Appx. 826 (6th Cir. 2009)............25

*Trihealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783 (6th Cir. 2005)......................................................................................17

*Willowbrook v. Olech*, 528 U.S. 562 (2000)...........................................................25

## **RULES**

Fed. R. Civ. P. 56(a)...............................................................................................16

MCL 764.15c .................................................................................................12, 13, 23

## COUNTER-STATEMENT OF MATERIAL FACTS

1.      Katie Williams arrived at the Canton Police Department (CPD) either at 11:30 p.m. on September 19, 2009 or on September 20, 2009 shortly after midnight. [Ex. 2, Falk Rpt.]. The remainder of Paragraph 1 is materially incomplete. *See* Additional Material Facts ¶¶ 1-3.

2.      Paragraph 2 includes facts that are supported by the record; however, they are materially incomplete. *See* Additional Material Facts ¶¶ 4-14.

3.      Plaintiff contests Paragraph 3; Katie gave Falk personal information [Ex. 1, Video Trx. at 3-13]; however, she did not give her name or provide her I.D. [*Id.* at 14]. *See* Additional Material Facts ¶¶ 2-14.

4.      Plaintiff contests Paragraph 4. The Canton domestic violence intervention policy states, "If the suspect cannot be located within a reasonable period of time (generally no longer than officer's tour of duty), a warrant should be sought…" [Ex. 18 at 9]. *See* Additional Material Facts ¶ 43.

5.      Plaintiff contests Paragraph 5. [Ex. 18, at 5-7 ("When responding to a domestic violence call, the officers shall… [a]rrest the assailant whenever possible when probable cause is established…")). *See also* Additional Material Facts ¶ 38.

6.      Plaintiff contests Paragraph 6. When an "assailant cannot be located," CPD's policy allows waiting only until the end of the officer's shift before seeking an arrest warrant. [Ex. 15, Kerr Dep. at 44]. *See also* Additional Facts ¶ 43.

7.      Plaintiff contests Paragraph 7 for the same reasons stated above in Paragraph 5. *See also* Additional Material Facts ¶ 38.

8.      Paragraph 8 includes facts that are supported by the record; however, they are materially incomplete. *See* Additional Material Facts ¶¶ 7-16.

9.      Plaintiff contests that she called CPD "the next morning." She called later the same morning that Katie appeared at CPD. [Ex. 4, Resst Rpt.]. Plaintiff also contests that the note was a "possible" suicide note. It was clearly a suicide note. [*See, e.g.* Ex. 8, LEIN Wkst.; Ex. 14, Schultz Dep. at 70-71, 111]. Paragraph 9 is also materially incomplete. *See* Additional Material Facts ¶¶ 18-22.

10.     Paragraph 10 includes facts that are supported by the record; however, they are materially incomplete. *See* Additional Material Facts ¶¶ 19-20.

11.     The notice identified Ed as "endangered missing" (not as a crime suspect), because Defendants treated Katie differently than victims of civilian domestic violence. [*See* Brief Argument §III.B.]. *See also* Add'l Facts ¶¶ 22-45.

12.     Paragraph 10 includes facts that are supported by the record; however, they are materially incomplete. *See* Additional Material Facts ¶¶ 18-20.

13.     Plaintiff admits Paragraph 13, although Plaintiff notes that the evidence appears in Defendants' Exhibit 5, not Exhibit 4.

14.     Plaintiff contests that DPD Sgt. Kozloff was qualified to assess that "all was well" with Ed Williams or that Defendant Schultz should have relied on

4

such a representation. *See* Additional Material Facts ¶¶ 28-34. However, Plaintiff admits that Kozloff made the statement and that Schultz removed the LEIN alert.

15.     Plaintiff admits Paragraph 15.

16.     Plaintiff contests Paragraph 16. Defendants treated Katie differently than similarly situated domestic violence victims whose assailants were not law enforcement officers. [*See, e.g*., Exs. 1, 2, 6-9, 13-27]. Plaintiff's Additional Material Facts sets forth these facts, including record citations, in a more coherent fashion than could be accomplished in response to Defendant's broad assertion in Paragraph 16. *See* Additional Material Facts ¶¶ 4-54.

## STATEMENT OF ADDITIONAL MATERIAL FACTS

**Relevant Events of September 19, 2009 through September 22, 2009:**

1.     Initially, when Katie Williams and Clifford Lee arrived at CPD around 12:00 a.m. on September 20, Lee told Defendant Falk that they were there "to make a report" about incident on Wall Street. [Ex. 1, Video Tr. at 2].

2.     Katie informed Falk that her husband had come to the marital home and assaulted her. [Ex. 1 at 3-4]. She told Falk that she and her husband had been separated for two months and were in the process of divorcing. [*Id.*] She also told him that both she and her husband were DPD police officers. [*Id.* at 5].

3.     Katie requested "an escort to my house to get my stuff and leave . . . ." [*Id.* at 5; *see also id.* at 3, 11, 12-13, 14].

5

4.      After being told Katie just wanted an escort to her house [*id.* at 3, 5, 11, 12-13, 14], Falk told Katie that he had to make a written report of what she had reported to him and send it to the prosecutor for a determination as to whether to charge Ed. [*Id.* at 5-6; *see also id.* at 10, 13-15, 17-18].

5.      Falk noted that Katie's abrasions were "evidence that a physical assault took place over there." [*Id.* at 6]. He observed "[t]here's obviously some kind of pattern going on here" and said that a report was necessary in the event that "something really serious happens." [*Id.* at 9-10].

6.      Katie responded that she did not want her husband to be charged with a crime and explained that she did not want to make a report for fear that her husband would "lose his job." [*Id.* at 6, 9, 10-11, 14].

7.      Lee informed Falk that Katie was worried about Ed "doing something to her" and that Ed had "threatened her before in the past." [*Id.* at 9].

8.      Falk says that he called his sergeant and asked "if there was any other avenues that he wanted [Falk] to take." [*Id.* at 11-13; Ex. 13, Falk Dep. at 13-14].

9.      When he returned, Falk confirmed three more times that Katie just wanted a police escort to go with her to her house. [Ex. 1 at 11-13].

10.     Falk again advised Katie multiple times that, "by law," he had to write a report, but even if he talked to or saw Ed that night, <u>he would not arrest Ed</u>. [*Id.* at 13]. He would, however, fax his report to the prosecutor. [*Id.* at 14-15, 17-18].

Katie told Falk that Ed dates all the prosecutors. [*Id.* at 14].

11.     Only then did Falk ask for Katie's name and identification. [*Id.* at p. 14]. Knowing that Falk would use the information to make a report and that Ed was not going to be arrested, Katie declined to provide the information. [*Id.*].

12.     Lee asked, "So you can't just do a[n] escort to take her to her house to get her stuff?" Falk said, "[N]ot at this point. We just gotta document it." [*Id.*].

13.     Katie informed Falk that Ed would likely "get wind of" the report, which would cause Ed to engage in "even more" violent behavior. [*Id.* at 16].

14.     Falk continued to insist on filing a report before providing a civil standby; he explained, "It's basically a paper trail. It's a cover our ass thing." [*Id.* at 17]. Katie left the station without receiving assistance. [*Id.* at 17-18].

15.     If Falk believed the information Katie gave him, there was probable cause to believe that a crime was committed. [Ex. 14, Schultz Dep. at 122-123].

16.     At 4:11 a.m., Falk prepared his report. He described the incident as a "domestic situation," noted no "evidence," characterized the incident as "not a crime," and "closed" the case. [Ex. 2, Falk Rpt.].

17.     When Defendant Schultz arrived for work 6:30 a.m., he was notified of Katie's interaction with Falk several hours earlier, including the allegation of domestic assault. [Ex. 14, Schultz Dep. at 10-12, 18]. He was advised that if any calls came in for Wall Street, it was probably her. [*Id.* p. 12].

18.     Around 9:15 a.m. that morning, Katie returned to her house to retrieve some of her belongings. Having been denied a police escort, her mother, Plaintiff Deborah Ryan, went with Katie. While Ed's car was not visible, he was waiting for them – he was drunk and had his gun drawn. [Ex. 12, Ryan Dep. at 60-61, 64-65].

19.     Katie asked her mom to call 911, which she did. [*Id.* at 66].

20.     Cliff Lee had also called Canton police and reported both the current situation and the previous evening's assault. [Ex. 3, Call for Service].

21.     Ed fled the house before Canton police arrived. [*Id.*]. Defendant Schultz was among the responding officers. [Ex. 14, Schultz Dep. at 26].

22.     Upon searching the house, Canton officers discovered a suicide note left behind by Ed. [Ex. 14, Schultz Dep. at 27, 45-46; Ex. 5, Suicide Note].

23.     Together, these facts established probable cause to arrest or seek a warrant for the arrest of Ed for domestic violence. [Ex. 13, Falk Dep. at 12, 14, 16-17, 32; Ex. 14, Schultz Dep. at 122-23; Ex. 15, Kerr Dep. at 19-20, 41-42, 51-52; Ex. 17,Wells Dep. at 8-9, 26; *see also* Ex. 18, CPD DIO at 2 ("the word of the victim alone, if believed, is sufficient grounds for establishing reasonable cause")].

24.     Around 10:00 a.m., Defendant Schultz called DPD Sergeant Martel and advised him of both recent incidents between Ed and Katie Williams and the suicide note. [Ex. 7, Schultz 1st Rep't; Ex. 6, Phone Trx. at 3-5]. Schultz advised that DPD should "get a hold of" Ed, regarding his "mindset." [*Id.* at 5].

8

25.     Defendant Schultz issued a "missing person" LEIN notice. [Ex. 8, LEIN Worksheet; see also Ex. 7, Schultz 1st Rpt.].

26.     In a subsequent phone call with Martell, Defendant Schultz advised that Ed would be listed on LEIN as "missing critical" until he made contact with a law enforcement agency to "verify his mental status." [Ex. 7, Schultz 1st Rpt.]. In one of their conversations, Schultz assured Martel that there would be no criminal investigation of the incident. [Ex. 6, Phone Trx. at 11].

27.     Defendant Schultz called Ed Williams on his cell phone and advised him of the LEIN notice and that he must see a DPD supervisor or come to CPD. [Ex. 7, Schultz 1st Report]. Schultz never even questioned Ed about the domestic violence incident itself nor asked that he come to CPD for questioning. [Ex. 14, Schultz Dep. at 81-86; Ex. 7, Schultz 1st Report].

28.     Around 6:00 p.m., Schultz also told DPD Lt. Barbara Kozloff, a Homicide supervisor, that Ed must be personally observed by police in order to be removed from LEIN. [Exh. 13, Schultz 2nd Rpt.; Ex. 14, Schultz Dep. at 83].

29.     Kozloff testified that Defendant Schultz advised her that CPD "did not have probable cause for an arrest" and that she should, therefore, not take Ed into custody [Ex. 19, Kozloff Dep. at 45, 55; *see also id.* at 106-07, 114, 125].

30.     Had Schultz requested Ed's arrest or informed DPD that Ed was "wanted in connection with a domestic violence" incident, DPD officers would

have arrested or detained Ed, taken possession of his gun, ordered him to seek

mental health care, and/or transport him to CPD upon his arrival. [Ex. 17, Wells

Dep. at 45; Ex. 19, Kozloff Dep. at 55, 106-07, 131].

31.     Just before 6:30 p.m., Ed met briefly with Kozloff in a DPD parking

lot. Kozloff did not ask about the gun, alcohol, flight from the scene, or domestic

assault because Schultz failed to inform her of these facts. [Ex. 19, Kozloff Dep. at

40-41, 44-45, 49, 61-62].

32.     After the conversation, Kozloff called Schultz and stated that "all is

well." [Ex. 6, Phone Trx. at 16; Ex. 14, Schultz Dep. at 92].

33.     Schultz cancelled the LEIN and closed the investigation without

inquiring into the content of Kozloff's conversation with Ed or identifying the

basis for her decision that "all was well." [Ex. 6 at 16; Ex. 14 at 92, 165].

34.     Had the LEIN notice remained active, CPD officers would have

tracked Ed down and "kick[ed] him into psychiatric" care. [Ex. 16, Steckel Dep. at

21-22, 24-25, 28; Ex. 14, Schultz Dep. at 152-57].

35.     Having been denied assistance from Defendants, Katie was left to deal

with Ed's abusive efforts to contact her one her own. Katie eventually agreed to

meet Ed at a "safe" location in front of the CPD precinct. [Ex. 10, Text Msgs].

After they met, Ed shot Katie four times as she tried to flee, finally executing her

with a shot to the head. He then shot and killed himself. [Ex. 11, Wells Rpt.].

10

**CPD Domestic Violence Policies and Michigan Statutory Requirements:**

36.     Pursuant to CPD practices, filing a report is not a prerequisite for receiving protective assistance, and such assistance should not be denied due to a citizen's refusal to provide her name. [Ex. 20, Wilshire Dep. at 34-35].

37.     Canton's domestic violence policy requires officers to "interview all parties," including the "victims, suspect, and other witnesses." [Ex. 18 at 5; Ex. 15, Kerr Dep. at 44, 53-54]. When an assailant cannot be located, CPD officers should attempt to locate the assailant and obtain a statement. [Ex. 15, Kerr Dep., p. 52].

38.     "When responding to a domestic violence call, the officers *shall* . . . [a]rrest the assailant whenever possible when probable cause is established that a crime(s) has been committed and the assailant committed the crime." [Ex. 18 at 5, 7 (emph. added))]; *id.* at 1, 7 ("arrest [is] the preferred response to domestic violence"); Ex. 14, Schultz Dep. at 123].

39.     Federal Rule of Civil Procedure 30(b)(6) witness Deputy Chief Kerr testified that when a CPD officer has probable cause to believe that domestic violence has been committed, the officer may: (i) write a report, (ii) request a warrant, (iii) make an arrest, or (iv) initiate a criminal investigation. [Ex. 15 at 43].

40.     CPD practices also allow for the arrest of domestic violence suspects who have refused to cooperate as a witness. [Ex. 13, Falk Dep. at 32].

41.     Officers responding to domestic violence incidents must complete a

11

departmental incident report form and "document the reasons for the probable

cause determination…" and "the reasons why an arrest was not made where

probable cause existed." [Ex. 18, DIO at 7].

42.     Officers "should not consider… [t]he wishes of either party" or "the…

occupation of either party" in determining probable cause. [*Id*. at 9].

43.     Where a domestic violence suspect has fled the scene and "cannot be

located within a reasonable period of time (generally no longer than an officer's

tour of duty), a warrant should be sought." [*Id*. at 9; Ex. 15, Kerr Dep. at 44].

44.     Schultz agreed that CPD's "normal policy would have been in this

situation to have it reviewed by a prosecutor once all the information was obtained

and Mr. Williams could have been interviewed…" [Ex. 14, Schultz Dep. at 66].

45.     According to Kerr, there "could have been sufficient grounds" to

arrest Ed; at a minimum, there was sufficient grounds to pursue further

investigation, such as locating and interviewing Ed. [Ex. 15, Kerr Dep. at 20, 52].

46.     Finally, the policy requires that the victim be provided with "Victim

Assistance," including "[p]rovid[ing] protection while essential property is

collected in preparation for leaving" and offering referrals to other support entities.

[Ex. 18, CPD DIO Policy at 10-11; Ex. 15, Kerr Dep. at 56-57].

47.     Moreover, Michigan statutory law "requires" certain actions of police

officers handling alleged domestic violence. MCL 764.15c; *People c. McLean*,

2011 WL 4056389 (Mich. App. 2011). Specifically, it demands that the following

actions be undertaken by investigating officer(s):

a. that they provide the victim with a written notice of her rights and of

   helpful and useful information (MCL 764.15c (1));

b. that they prepare a report, explicitly denominated as "a Domestic

   Violence Report" (MCL 764.15c (2)); and

c. that they send a copy of the Report to the prosecutor within 48 hours

   "after the incident" (MCL 764.15c (3)).

**Similarly Situated Domestic Violence Victims of Civilian Assailants:**

48.     Defendants produced 68 files pertaining to cases in which Schultz or

Falk responded to a partner-on-partner domestic violence situation where the

suspect was not a police officer; 66 involved Falk and 2 involved Schultz.[1]

49.     In all 68 cases, the responding officers either arrested the party

suspected of committing domestic violence on the scene or requested a warrant for

his or her arrest. Whether or not an arrest was made on scene, a warrant request

was also submitted to the prosecutor's office in every single case. [Ex. 21,

Declaration, ¶15 & 16; Ex. 22, column E].

50.     All 68 cases produced by the Defendants fail to identify, in the police

---

[1] See Exhibit 21, Declaration of Andrew Goddeeris, for a summary of the documents. Exhibits 21 and 22 are offered pursuant to FRE 1006 for the Court's convenience. All files described in therein can be made assessable upon request.

reports, the suspect's occupation as a factor influencing police procedure and/or conduct. [Ex. 21, Declaration, ¶17; Ex. 22, column G].

51.     In 24 cases, the victim indicated that he or she did not wish to prosecute the suspect. In all of those cases, the officers ignored the victim's wishes and sought a warrant. [Ex. 21, Declaration, ¶18]. The officers did so even in situations where the victim begged the officer not to arrest the suspect and attempted to recant his statement, where the victim told the officer that an arrest would prompt her attacker to kill her, and where the victim told the officer that she did not want to get her husband in trouble. [Exs. 25-27, Comparative Rpts.].

52.     Officers filled out Domestic Violence Incident Reports and provided the victim with victim's rights information in 65 – almost all of the cases. [Ex. 21, Declaration, ¶19; Ex. 22, column H; *see also, e.g.,* Exs. 24-28]. In the other three cases, the records do not contain sufficient information to determine if a report was written or not.[2] [Ex. 21, Declaration, ¶19].

53.     Out of the 68 comparable cases, 12 files noted that the suspect fled the immediate scene of the incident. [Ex. 21, Declaration, ¶20]. In all but two such cases, the files contain evidence that Defendants or their coworkers attempted to locate the suspect. [*Id.*]. Even in the two files where no such effort is apparent from

---

[2] Defendants provided only their own supplemental reports. The presumption of regularity suggests that a D.V. Incident Report was attached to another report within the file. *Dell v. Straub*, 194 F.Supp.2d 629 (E.D. Mich. Feb. 28, 2002).

the records, a Domestic Violence Incident Report was completed and warrant was requested from the prosecutor – one warrant was denied; the other was approved and the suspect was arrested. [Ex. 21, Declaration, ¶20].

54.     In addition, the case files demonstrate a strong pattern of interviewing the suspect, in accordance with CPD policy. Out of the 68 comparable cases, the suspect was interviewed in 57 cases. Six case files contained insufficient information to determine whether the suspect was interviewed.[3] In only five cases, the suspect was not interviewed, for various reasons. [Ex. 22, column I].

## I.     <u>INTRODUCTION</u>

Defendants seek summary judgment for the fourth time. [Docs. #93, #122, #147 & #159]. This Court denied the first three motions: first, because Defendants argued against state created danger liability, rather than equal protection [Doc. #120, PgID 2714-15]; second, because Defendants refused to produce discovery [Doc. #126, PgID 3075-77]; and third, because the parties briefed "class of one" liability, rather than traditional equal protection. [Doc. #158].

Now, Defendants have addressed the correct legal standard and even asserted a "rational basis" argument, which they previously waived. [See Docs. #126 & #158]. Still, this Court should deny their motion because there are genuine issues that must be decided by a jury. Specifically, there is evidence that Katie was

---

[3] See, for example, Exhibit 24, Case Rpt. No. 110003305, where Schultz had a limited role in the investigation, and it is obvious that other reports are missing.

a member of an "identifiable group" of domestic violence victims whose assailants are police officers and that Defendants intentionally treated Katie differently than similarly situated victims who were not members of her group. Moreover, there is a genuine dispute as to whether Defendants' actions lacked a rational basis.

## II.   <u>APPLICABLE LAW</u>

### A.   SUMMARY JUDGMENT

Courts should grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

When evaluating a summary judgment motion,

> …credibility judgments and weighing of the evidence are prohibited.  Rather, the evidence should be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

*Biegas v. Quickway Carriers*, 573 F.3d 365, 373 (6th Cir. 2009) (brackets and quotation marks omitted). A reasonable jury could find that Defendants violated Katie's right to equal protection here. Summary judgment is therefore improper.

### B.   QUALIFIED IMMUNITY

Qualified immunity shields officers from liability only "…insofar as their conduct does not violate clearly established statutory or constitutional rights of

16

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts should apply a two-part approach to this inquiry, asking whether the plaintiff has asserted a violation of a constitutional right, and whether the constitutional right was clearly established. *Gregory v. Louisville*, 444 F.3d 725, 475 (6th Cir. 2006). Courts have discretion to determine the order in which to address these two elements. *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).

In *Saucier v. Katz*, the Supreme Court explained that a right is "clearly established" where "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." 533 U.S. 194, 202 (2001). "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).

## C. EQUAL PROTECTION

The Equal Protection clause of the Fourteenth Amendment established that "all persons similarly situated should be treated alike" and operates to bar discrimination or disparate treatment based on classifications that are not rationally related to a legitimate government purpose. *See City of Cleburne, Texas v. Cleburne Living Center, Inc.,* 473 U.S. 432, 439 (1985) ("[a]n equal protection violation occurs when the government treats someone differently [from] another who is similarly situated"); *Trihealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty.,*

17

*Ohio*, 430 F.3d 783, 788 n.3 (6th Cir. 2005) ("Intentional discriminatory treatment without rational basis is the hallmark of any equal protection claim"); *Cellini v. City of Sterling Heights*, 856 F. Supp. 1215, 1223 & n.4 (E.D. Mich. 1994).

Rational basis review applies both to class of one claims, as well as claims of arbitrary discrimination against an "identifiable group." *Davis v. Prison Health Srvs.*, 679 F.3d 433, 441-442 (6th Cir. 2012).

Although comparative evidence is considered in evaluating these claims, the Court need "not demand exact correlation, but should instead seek relevant similarity." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 463, 465 (6th Cir. 2012) (internal quotation marks omitted).

This Court must also consider whether Defendants departed from their written policies and general practices for other cases when evaluating whether Plaintiff was treated differently. *See Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000); *see also Engquist v. Ore. Dep't of Agr.*, 553 U.S. 591, 602-03 (2008) (relying on "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed").

## III.   ARGUMENT

### A.   Katie was a Member of an "Identifiable Group".

Defendants concede this factor, as they make no argument to the contrary. Nonetheless, there is evidence that Defendant identified Katie Williams as a

domestic violence victim whose assailant was a police officer [Exs. 1, 2, 6-9] – as opposed to similarly situated victims whose assailants were civilians. [Ex. 21-27].

**B.    Defendants Treated Katie Differently than Other Similarly Situated Victims Whose Assailants were not Police Officers.**

Under CPD policy – and Michigan law – Defendants were required to: interview all parties, attempt to locate the suspect, arrest the assailant whenever possible, complete a D.V. Incident Report, request a warrant, ignore the parties' wishes and occupations, and provide victim assistance. [*See* Add'l Facts, ¶¶36-47].

In addition to Defendants' admission that "the testimony shows this situation was handled differently based on Ed's status as a police officer…" [Doc. #109, Pg ID 2366], there is also ample evidence of this discriminatory treatment.

### 1.  Falk Treated Katie Differently Than Other Victims.

For domestic violence victims whose assailants were civilians, Defendant Falk followed policy. [*See* Additional Facts, ¶¶48-54]. Even when narrowing the comparable files to those that pre-dated this incident and where Falk was the officer in charge, in all 18 of those cases, Falk or another officer completed a D.V. Incident Report, the suspect was arrested on the scene or a warrant was requested within 24 hours (or both), and there is no indication that the suspect's occupation was taken into account. [*See* Defs' Amended Exh. #9A-9R, Doc. #160].

However, Falk treated Katie differently:

- Defendant Falk refused to provide a civil standby unless Katie consented to

file an official report, even though such a report was not necessary to receive

protective services. [Ex. 1, Video Tr. at 5-6, 10-12; Ex. 20, Wilshire Dep at 34-35];

- Falk told Katie, "I'm not gonna [*sic*] arrest him," even though the abrasion

on her face constituted clear evidence of the assault. [Ex. 1 at 6, 13];

- Falk relied on Katie's reluctance to prosecute; rather than provide the civil

standby, then use the information to file a D.V. Report and seek a warrant; and

- Falk filed a civil (non-criminal) report, rather than a D.V. Incident Report,

and failed to provide Katie with notice of her rights. [Ex. 2, Falk Rpt.].

Defendants argue that none of the comparable files they produced in

discovery include similarly situated domestic violence victims because Katie

walked into CPD (as opposed to Falk having been dispatched to the scene) and

Katie refused to give personal information. [*See* Doc. #159, Pg ID 4608]. Setting

aside Defendants' pattern of unilaterally limiting discovery only to argue that the

material they eventually produced is irrelevant, the argument itself is unavailing.

First, whether individuals are similarly situated is a question for the jury.

*Loesel, supra* at 463. Second, similarly situated comparatives do not require exact

correlation, but rather "relevant similarity." *Id*. All files summarized in Exhibits 21

and 22 are relevantly similar insofar as they involve allegations of partner on

partner domestic violence wherein Falk or Schultz played an investigative role.

Moreover, the fact that Katie appeared at CPD is of no consequence since

20

she came requesting that an officer come to her home. Had Falk complied with this request, he or another officer would have arrived at the home, just as if he had been summoned by a phone call, as was the case in many of the comparable files.

Finally, Katie's eventual refusal to provide personal information also raises a genuine issue for the jury. Significantly, Falk never asked for this information until <u>after</u> he told Katie that he would not arrest Ed that night. [Ex. 1, Video Trx. at 13-14]. A reasonable jury could conclude that Falk deliberately scared Katie into backing off of her request for assistance <u>before</u> he sought her personal information.

Indeed, in at least two comparable cases, the victims initially refused provide personal information; yet, Falk provided assistance and eventually obtained the information. [Exs. 25 & 26, CR No. 07005679 (caller hung up on dispatch and initially refused to give information) & 090022167 (victim refused to let Falk into her home; the victim and suspect were "later identified" through unspecified means; Falk monitored the home until the suspect returned and arrested suspect)].

## 2. Schultz Treated Katie Differently Than Other Victims.

Defendants provided only two comparative files for Defendant Schultz. [Exs. 23 & 24]. In those two cases, he substantially complied with state law and with CPD's policies. The jury can infer that Schultz properly discharged his

official duties in similar circumstances prior to 2007.[4] *Dell v. Straub*, 194

F.Supp.2d 629 (E.D. Mich. Feb. 28, 2002) ("(A) presumption of regularity exists

with respect to the official acts of public officers, and absent evidence to the

contrary, the court presumes that the official duties were discharged properly.");

*Gibson v. Jackson*, 2007 WL 3227579 (E.D. Mich. Oct. 31, 2007).

However, with Katie, Schultz approached the facts quite differently:

- Despite having probable cause to arrest Ed, Schultz did not attempt to arrest

or seek a warrant. [*See, e.g.*, Exs. 7-9, 14, Schultz Rpts. & Dep.];

- Instead, Schultz issued a "Missing Person" LEIN notice that omitted any

reference to the criminal nature of Ed's conduct. [Ex. 8, LEIN Worksheet];

- Schultz told DPD Sgt. Martel that there was not going to be a criminal

investigation, and cited Katie's wishes as the reason [Ex. 6, Phone Trx. at 11];

- Schultz did not question Ed about the domestic violence; instead, he told

him that the LEIN notice would be removed if he spoke with his own employer.

[Ex. 7, Schultz 1st Rpt.; Ex. 14, Schultz Dep. at 81-86];

- Schultz told DPD Sgt. Kozloff that there was no probable cause to arrest Ed.

[Ex. 19, Kozloff Dep. at 55]. He failed to inform her of material facts of the

domestic violence incidents. [*Id.* at 40-41, 44-45, 49, 61-62];

- Schultz removed the LEIN and "considered the matter closed" based on

---

[4] Defendants refused to produce any files prior to 2007, when CPD began
electronically storing reports. [*See* Doc. #128-3].

Kozloff's statement that "all is well". [Doc. #93, Pg ID 1458, 1472]. With non-police-officer suspects, Defendants admit that they would investigate more before dropping a case. [Ex. 13, Falk Dep. at 12-17, 25-26]; and

- Schultz also did not provide Katie with any victim assistance, referrals, or the written notice or her rights as required under law. *See* MCL § 764.15c.

Based on the evidence outlined above, there are genuine issues of material facts that must be decided by a jury and a reasonable jury could conclude that Defendants treated Katie differently than similarly situated domestic violence victims whose assailants were not police officers.[5]

### 3. Arrest of DPD Officer in August 2011

Defendants produced one case file in which the suspect was reported to be DPD officer. [Ex. 28, Case Rpt. No. 110039066]. Defendants have provided no argument as to the significance of this file, if any; however, careful review of the file reveals that the officers responded superficially to the victim's claims.

On August 16, 2011, Defendant Falk and his partner were dispatched to a "possible domestic situation" at a motel. The suspect fled the scene before they

---

[5]Defendants rely heavily on *Burella v. City of Philadelphia*, 501 F.3d 134 (3rd Cir. 2007), despite its inapplicability: 1) the Third Circuit case is not binding; 2) the plaintiff therein asserted multiple equal protection theories based on her status as a female, a domestic violence victim, and as the victim of a police officer; 3) the court did not carefully separate the bases for individual and municipal liability in its analysis; and 4) the plaintiff therein did not have the evidence of differential treatment based on admissions, deviation from statutory obligations, written policies, standard practices, and comparative evidence as are present here.

arrived; however, he returned at the officers' request. [Ex. 28, narrative]. Falk's report indicates that the victim reported that her jaw hurt and that she had scratches on her face; however, there are no photos, and the D.V. Incident Report states that there were no observed injuries. [Ex. 28]. The Report also indicated that the victim wished to cooperate with prosecution, but there is no statement by the victim in the file. A warrant was requested; however, the prosecutor denied the warrant and stated: "unable to contact complainant, statement given by suspect, no injuries observed." [Ex. 28, *see* warrant denial instructions].

At first blush, it appears that Falk treated this victim according to policy: he and his partner located and interviewed the suspect, completed a D.V. Incident Report, and requested a warrant. However, the warrant denial was a foregone conclusion because Falk failed to obtain a statement from the victim, who was willing to cooperate. There is also no explanation for the failure to take photos of the victim's injuries, which were noted in Falk's report but not in the D.V. Incident Report. Indeed, it appears that the purpose of interviewing the police officer suspect was to exonerate him by obtaining his statement but not the victim's.

Moreover, the August 2011 incident occurred nearly two years after Ed Williams murdered Katie. "[C]ourts must be sensitive to the possibility that differential treatment—especially differential treatment following a time lag—may indicate a change in policy rather than an intent to discriminate. Consequently, the

most reliable comparisons are likely to be from roughly the same time frame."

*Taylor Acquisitions v. City of Taylor*, 313 Fed. Appx. 826, 836-37 (6th Cir. 2009).

CPD was certainly aware of Katie's high profile murder in the parking lot adjacent to CPD.[6] Defendants had every reason to "cover [their] ass" a bit more in 2011 after the tragedy that befell Katie Williams. Thus, the August 2011 incident is not a reliable comparison, to the extent that Falk handled it somewhat differently. If anything, the superficial nature of the follow through on that case strengthens Plaintiff's argument that Defendants disfavor victims of police officers.

### C.    **Defendants' Discriminatory Treatment was Intentional.**

Plaintiff need not prove animus or ill will. *Willowbrook v. Olech*, 528 U.S. 562, 565 (2000) (holding that irrational and wholly arbitrary action is sufficient for traditional equal protection). Rather, she must only demonstrate evidence of discriminatory purpose. *McCleskey v. Kemp*, 481 U.S. 279, 298 (1987).

The evidence in this case, demonstrates that Defendants treated Katie differently specifically because her assailant was a police officer. Defendants were aware that Ed Williams was a police officer and they refer to this fact in every action they took. [Exs. 1-3, 6-9]. A reasonable jury could conclude that Schultz included this fact in the LEIN notice to alert other police agencies to Ed's special status as a police officer. Notably, the very reason that Canton called the DPD and

---

[6] Indeed, an attorney representing Katie's estate contacted CPD on October 20, 2009 to request the complete file, pursuant to FOIA. [Ex. 19].

25

sought to place the matter in Detroit's hands was that "all three people were police officers." [Ex. 14, Schultz Dep. at 57].

These "unexplained discrepanc[ies] in the treatment of victims of domestic assault [through the discrepancies in the treatment of their assailants] could legitimately give rise to an inference that the police department acted with discriminatory motive in employing its domestic violence policy." *Cellini*, 856 F. Supp. at 1222. The above facts create a genuine dispute as to the basis for Defendants' differing treatment of Katie, which precludes summary judgment.

### D. __Defendants Lacked a Rational Basis for Treating Katie Differently.__

In applying the "rational basis" test, courts may not uphold discriminatory conduct where "the varying treatment of different groups or person is so unrelated to the achievement of any combination of legitimate that the court can only conclude that the government's action were irrational." *Sadie v. City of Cleveland*, 718 F.3d 596, 601 (6th Cir. 2013). Where a genuine dispute exists as to whether the action lacked a rational basis, a jury must decide the issue. *Loesel* at 466.

Defendants' asserted rational bases are patently irrational. First, they argue that they treated Katie differently because "Ms. Williams requested it." [Doc. #159, Pg ID 4610]. Defendants cling to the very victim-blaming excuse that CPD's written policy and Michigan law are designed to eliminate. The DIO Policy itself seeks to establish a "uniform policy" to "eliminate indecision" and "reduce

26

domestic homicides." [Ex. 18]. It would be erroneous to accept this explanation, which subverts the express purpose of the CPD Policy.

Second, Defendants argue that officers must respond to domestic violence with "flexibility" and utilize resources other than "criminal sanctions"; therefore, Defendants were justified in addressing Ed's mental health concerns and his fitness for duty as a police officer. However, this analysis, which is based on 1991 case law from the Southern District of Ohio, again ignores CPD policy on domestic violence intervention, which requires uniformity.

These purported "rational bases" do not address the breadth of evidence of discrimination in this case. They do not explain why Defendants failed to provide Katie victim assistance; why Schultz never questioned Ed about the domestic violence allegations; why neither Defendant filed a D.V. Incident Report or sought a warrant from the prosecutor; why Schultz informed Ed and DPD that they could have the LEIN alert removed and the investigation closed by simply having a discussion between Ed and his DPD supervisor; why Schultz told DPD that Canton would not criminally investigate Ed; why Schultz informed DPD that there was no probable cause to arrest or detain Ed (when there was); or why Schultz closed the Williams file without any substantive criminal investigation.

Defendants' actions were thus "not animated by legitimate governmental purpose and cannot survive even rational basis review." *Craigmiles v. Files*, 312

F.3d 220, 228 (6th Cir. 2002).

**E.    Katie's Right to Equal Protection was Clearly Established.**

This Court must determine whether the "alleged violations involved a constitutional right that was clearly established at the time of the alleged misconduct." *Grawey*, *supra*, at 314; *see also Harlow v. Fitzgerald*, 457 U.S. 800 (1982). In other words, Plaintiff must show that Defendants were "on notice that [their] actions were unconstitutional" as of September 2009. *Id.* at 314. "[A]n action's unlawfulness can be apparent from direct holdings, from specific examples described as prohibited, or from general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003).

In making this determination, courts look to their own decisions, Sixth Circuit decisions, Supreme Court decisions and, when useful, decisions from other circuits.  *See Barrett v. Stubenville City Schs.*, 388 F.3d 967, 972 (6th Cir. 2004); *see also Ohio Civil Service Employees Association v. Seiter*, 858 F.2d 1171 (6th Cir. 1988) (holding a right can be clearly established when the decisions of other circuits have clearly established the right in question – even when the Sixth Circuit and the Supreme Court have not yet explicitly ruled). Furthermore, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 533 U.S. at 202.

The Sixth Circuit has held that a plaintiff need not present a case that is

28

factually identical to her own. In *Kijowski v. Niles*, 372 Fed.Appx. 595 (6th Cir. 2010), the Sixth Circuit stated that it need not be shown that the "very action in question" had previously been held unlawful. *Id.* at 601. Rather, the unlawfulness of an act may be apparent from "direct holdings, from specific examples described as prohibited, or from general reasoning that a court employs." *Id.*  Also "there need not be a case with the exact same facts or even 'fundamentally similar' or 'materially similar'; rather, the question is whether Defendants had 'fair warning' that their actions were unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

Long before September 19, 2009, Katie's right to equal protection was clearly established. In 1983, the Sixth Circuit held in *Smith v. Ross*, 482 F. 2nd 33 (6th Cir. 1973) that "a law enforcement officer can be liable under § 1983 when by his inaction he fails to perform a statutorily imposed duty to enforce the laws equally and fairly…" *Id* at 36-37.

This Court through Judge Murphy has held:

> A violation of a state policy… is relevant… to the question of whether the defendant violated [the plaintiff's] clearly established constitutional rights.

*Landis v. Galarneau*, 2010 WL 458143 (E.D. Mich. Feb. 3, 2010).

Many courts, including this one through Judge Cohn, held prior to 2009 that the right to equal protection applies to the administration of police services. *See, e.g.*, *Estate of Macias v. Ihde*, 219 F.3d 1018, 1028 (9th Cir. 2000) ("There is a

29

constitutional right . . . to have police services administered in a nondiscriminatory manner"); *Cellini v. City of Sterling Heights*, 856 F.Supp. 1215, 1220 (E.D. Mich. 1994) ("the state may not discriminate in providing [police] protection"); *Bartalone v. Cnty. of Berrien*, 643 F. Supp. 574, 577 (W.D. Mich. 1986).

Thus, the law of equal protection and CPD's own policies demonstrate that Katie's right to police protection for domestic violence without regard to her assailant's occupation was clearly established.

## IV.    CONCLUSION

WHEREFORE, for these reasons, Plaintiff respectfully requests that this Court deny Defendants' Second Renewed Motion for Summary Judgment.

Respectfully submitted,

GOODMAN & HURWITZ, P.C.          -and-
*By: Kathryn Bruner James*          GOODMAN KALAHAR
Kathryn Bruner James (P71374)          By:  Kathleen J. Kalahar (P60301)
1394 E. Jefferson Ave.          1394 E Jefferson Ave
Detroit, MI 48207          Detroit, MI  48207
(313) 567-6170/Fax: (313) 567-4827          (313) 567-6165/Fax: (313) 567-4827
kjames@goodmanhurwitz.com          kkalahar@goodmankalahar.com
*Attorneys for Plaintiffs*          *Co-Counsel for Plaintiffs*

Dated: May 18, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on May 13, 2015, I electronically filed the foregoing pleading with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.

*/s/Anneliese Failla* _____
Anneliese Failla
Legal Assistant to Kathryn Bruner James

## LOCAL RULE CERTIFICATION

I, Kathryn Bruner James, certify that this documents complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

*/s/Kathryn Bruner James*
Kathryn Bruner James (P71374)

## **EXHIBIT LIST**

1.  CPD Front Desk Video Transcript, 9/20/2009

2.  Falk Civil Report re: Katie's Civil Standby Request, 9/20/2009

3.  Call for Service re: Wall Street incident, 9/20/2009

4.  Resst Report re: Wall Street Incident, 9/20/2009

5.  Ed Williams' Suicide Note

6.  CPD-DPD Phone Calls Transcript, 9/20/2009

7.  Schultz First Supplemental Report re: Martel Phone Calls, 9/20/2009

8.  LEIN Worksheet re: Missing Person, 9/20/2009

9.  Schultz Second Supplemental Report re: Kozloff Phone Calls, 9/20/2009

10.  Text Messages

11.  Wells Report, 9/22/2009

12.  Deborah Ryan Deposition Transcript Excerpts, 5/4/2012

13.  Defendant Falk Deposition Transcript Excerpts, 7/27/2011

14.  Defendant Schultz Deposition Transcript Excerpts, 7/25/2011

15.  Deputy Chief Kerr Deposition Transcript Excerpts, 3/25/2013

16.  Officer Steckel Deposition Transcript Excerpts, 7/25/2011

17.  Deputy Chief Wells Deposition Transcript Excerpts, 3/30/2012

18.  CPD Domestic Intervention Operations (DIO) Policy

19.  DPD Sgt. Kozloff Deposition Transcript Excerpts, 3/19/2012

20.  Sgt. Wilshire Deposition Transcript Excerpts, 6/19/13

21.  Declaration of Andrew Goddeeris

22.  Chart of Schultz & Falk Domestic Violence Report Data

23. Case Report No. 110002530 Excerpts (Schultz)

24. Case Report No. 110003305 (Schultz)

25. Case Report No. 070056479 Excerpts (Falk)

26. Case Report No. 090022167 Excerpt (Falk)

27. Case Report No. 130040088 Excerpts (Falk)

28. Case Report No. 110039066 (Falk)

29. FOIA Correspondence