UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBORAH RYAN,

        Plaintiff,

                                  Case No. 11-cv-10900

v.

                                  HON. MARK A. GOLDSMITH

CITY OF DETROIT, et al.,

        Defendants.

_____/

## OPINION AND ORDER
## GRANTING DEFENDANTS FALK AND SCHULTZ'S MOTION FOR SUMMARY JUDGMENT (Dkt. 159)

This case centers on a heart-breaking tragedy — the senseless murder of a young mother by her mentally unstable, estranged husband. With the perpetrator of the heinous act beyond the reach of any court, the victim's mother brings this action to hold police officers accountable for this tragedy. However, having thoroughly reviewed the briefs and record, the Court concludes that there is no evidence presented that the remaining Defendants violated the victim's claimed constitutional right.

This is a civil rights case brought pursuant to 42 U.S.C. § 1983, filed by Plaintiff Deborah Ryan in her individual capacity and as the representative of the estate of her daughter, Patricia "Katie" Williams. The suit alleges that Canton police officers Adam Falk and Mark Schultz, among others, failed to properly respond to a report made to the Canton Police Department on September 19, 2009 of domestic violence committed by Ed Williams upon his wife, Katie, both of whom were Detroit police officers. Plaintiff alleges that Defendants' failure enabled Ed to murder Katie three days later on September 22, 2009. In her § 1983 claim alleging equal-protection violations against Falk and Schultz (collectively, for purposes of this opinion,

1

"Defendants"), Plaintiff contends that Katie was treated less favorably than other alleged victims of domestic violence because her assailant was a police officer.

This matter is before the Court on Defendants' fourth motion for summary judgment (Dkt. 159), in which Defendants argue that they are entitled to qualified immunity because they did not violate a clearly established constitutional right. For the reasons explained fully below, the Court grants the motion, as Plaintiff has failed to raise triable issues of fact showing that: (i) Defendants engaged in intentional discrimination; (ii) there were domestic violence victims treated more favorably who were similarly situated to Katie; and (iii) a class of such favored victims assaulted by persons outside of law enforcement exists.[1]

## I. BACKGROUND

The Court addressed the factual and procedural background of this case in an opinion and order granting in part and denying in part a motion for summary judgment filed by the City of Canton, Falk, and Schultz. See Ryan v. City of Detroit, 977 F. Supp. 2d 738, 741-745 (E.D. Mich. 2013). The Court will only repeat from that recitation of the factual and procedural background the portions that relate to these particular Defendants:

> Ed Williams, a Detroit Police Department ("DPD") homicide detective, was married to Katie Williams, a DPD academy instructor. By 2009, the couple had been married for approximately three years and owned a home on Wall Street in Canton, Michigan. Ed and Katie had marital difficulties, however, and, by September 2009, they had not been living together for two months.
>
> At about 9:45 p.m. on the evening of Saturday, September 19, 2009, Ed came to the Wall Street home and found Katie talking to her boyfriend, Clifford Lee, on the phone. An argument ensued, which culminated in Ed pushing Katie to the ground; Katie

---

[1] Because oral argument will not aid the Court, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2).

sustained a cut on her right cheek. Shortly after midnight, Katie and Lee arrived at the Canton Police Department ("CPD") headquarters and requested a police escort to accompany Katie back into the home.

Officer Adam Falk was on duty at the CPD headquarters and interviewed Katie. Katie described the domestic violence episode with her husband, but refused to provide her name or Ed's name. Katie told Falk that she and her husband were both Detroit police officers and that she did not want Ed to lose his job.

Falk informed Katie that all he could do was write a report and let the prosecutor make the determination whether Ed would be charged. Falk said that he would write a report, but would not seek the arrest of Ed based on the information Katie gave him. Falk also mentioned that the report was a "cover our ass thing," in case "something really serious happens." Katie then left the CPD headquarters with Lee. Just before she left the police headquarters, Falk asked Katie "Do you still want anybody to go over to the house?" Katie responded "No."

Falk prepared a report of his interview with Katie. The report described the incident as a "civil matter" with a disposition of "closed, for documentation only at this time." Falk's report recounts his encounter with Katie and Lee, including Katie's account of the events where Ed pushed her and she sustained a cut on her cheek. The report also notes that Katie did not want to file a report, and that she wanted a police escort to her home to collect some things, known as a "civil standby," but then stated that she did not want any assistance and left the station. According to the report, Falk communicated this encounter to his supervisors.

Katie then returned home the morning of September 20, accompanied by Plaintiff, her mother. Katie entered the home unaware that Ed was there. According to Plaintiff, the women had an altercation with Ed, which involved yelling and a scuffle. During this incident, Ed was holding a handgun and intoxicated. Plaintiff called the Canton police for help, but when the police arrived they found that Ed had fled. They also found that Ed had left a note, which one of the responding officers, Lieutenant Mark Schultz, considered to be a "suicide note."

3

Shortly after Ed had fled, Schultz issued a notice through the Law Enforcement Information Network (LEIN) regarding Ed. Schultz also contacted DPD to notify them of the incident between two of its officers. The transcript of Schultz's initial call to Sergeant Martel of DPD reveals that he wanted DPD apprised of the situation so that it would "get a hold of" Ed. Schultz explained to Martel that he did not think the domestic violence incident would get a full investigation because (i) CPD did not have enough information, (ii) initially, Katie did not provide her name, and (iii) Falk had only written a civil report. Schultz also told Martel that he was concerned that there may be a "workplace issue" because, from Schultz's understanding, Ed did not know the identity of Katie's boyfriend, Lee, a fellow DPD officer.

In deposition, Schultz testified that if DPD wanted to do an internal investigation, CPD would provide DPD with information. Schultz also stated that he hoped that DPD could get a hold of Ed to assess his "mental state."

\*      \*      \*

According to Schultz, he had a brief conversation with Ed a little after 6 p.m. on September 20, 2009. Schultz told Ed that he knew Ed had left the note. Ed responded that the note did not mean anything. Schultz also told Ed that he had entered the LEIN notice, listing him as a "missing person endangered." Schultz said that he would not remove the notice until Ed came to see Schultz or went to his supervisor at DPD. Ed said that he was closer to Detroit, so Schultz told Ed to have his supervisor call him when he got to DPD.

Although it is not entirely clear from the record, apparently Schultz notified DPD that Ed was coming to check-in with them. At some point prior to Ed's arrival at DPD, DPD determined that Sergeant Barbara Kozloff of DPD would speak with Ed. Kozloff testified that, prior to meeting Ed, she had a phone call with Schultz. Schultz apprised Kozloff of the basic facts of the morning incident in Canton. Kozloff testified that she asked Schultz if she had to take Ed into custody. Schultz said no because there was no probable cause to arrest Ed.

4

\*       \*       \*

> Upon arriving at DPD, Ed met with Kozloff.  Ed told Kozloff of
> his marital strife, relating the argument with Katie that morning at
> the Canton home.  Kozloff also testified that Ed stated that when
> Ed heard police sirens, he left the home.  Kozloff did not inquire
> further because she had not been apprised of any other facts by
> Blackmon, Martel, or Schultz.
>
> After meeting with Ed, Kozloff called Schultz at approximately
> 6:30 p.m. and told him that "all is well" with Ed.  Relying on
> Kozloff's representation that "all is well," Schultz removed the
> LEIN notice.  The timing of the LEIN notice removal is unclear
> from the record.
>
> Late in the evening the next day, Monday, September 21, 2009, Ed
> and Katie spoke on the phone and agreed to meet the next morning
> in the Canton public library parking lot.  On September 22, 2009,
> Ed and Katie met as planned at approximately 8 a.m. and spent
> about an hour talking on a bench near the parking lot.  After about
> an hour, the couple got up from the bench, and Ed retrieved a
> personal handgun from his car.  Ed then shot and killed Katie with
> his personal handgun in the parking lot.  He then committed
> suicide by turning the gun on himself.

Ryan, 977 F. Supp. 2d at 741-743 (internal citations and footnotes omitted).

## II.  STANDARD OF REVIEW

A court "shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  When evaluating a summary judgment motion,

> credibility judgments and weighing of the evidence are prohibited.
> Rather, the evidence should be viewed in the light most favorable
> to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477
> U.S. 242, 255 (1986).  Thus, the facts and any inferences that can
> be drawn from those facts must be viewed in the light most
> favorable to the non-moving party.  Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Biegas v. Quickway Carriers, 573 F.3d 365, 373 (6th Cir. 2009) (quotation marks and brackets omitted).

When a defendant seeks summary judgment, the defendant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "To withstand summary judgment, the nonmoving party must present sufficient evidence to create a genuine issue of material fact." Humenny v. Genex Corp., 390 F.3d 901, 904 (6th Cir. 2004). The opposing party "may not rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion." Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009). A mere scintilla of evidence is insufficient; rather, "there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson, 447 U.S. at 252.

## III. ANALYSIS

The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination by the government that "'burdens a fundamental right, targets a suspect class, or intentionally treats one differently than others similarly situated without any rational basis for the difference.'" Loesel v. City of Frankenmuth, 692 F.3d 452, 461 (6th Cir. 2012) (quoting Rondigo, L.L.C. v. Twp. of Richmond, 641 F.3d 673, 681-682 (6th Cir. 2011)). Plaintiff does not contend that a fundamental right has been burdened. Nor does she claim that Katie belonged to a suspect class. Therefore, the Court must determine if Defendants intentionally treated Katie differently —

because her assailant was a police officer — in contrast to the way they allegedly treated similarly situated victims of domestic abuse whose assailants were not police officers.[2]

Furthermore, unless Plaintiff can establish both a constitutional violation and that the violated right was clearly established at the time of the challenged conduct, the doctrine of qualified immunity shields Defendants from civil liability.  Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (per curiam) (citing Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)).  If Plaintiff is unable to establish a violation of Katie's constitutional right to equal protection, the Court's inquiry ends, and Defendants are entitled to qualified immunity.  Perez v. Oakland Cnty., 466 F.3d 416, 426-427 (6th Cir. 2006).

Defendants contend that summary judgment should be granted in their favor based on qualified immunity, arguing two central points: (i) they committed no constitutional violation, because Katie was not intentionally treated differently than similarly situated individuals; and (ii) there is no clearly established right to police protection for domestic violence without regard to the assailant's occupation.  For the reasons discussed below, the Court concludes that Plaintiff has failed to raise a genuine issue of fact that Defendants committed a constitutional violation. Based upon that conclusion, the Court grants Defendants' motion based on qualified immunity, without addressing the "clearly established right" component.

### A.  No Evidence of Intentional Discrimination

The Equal Protection Clause prohibits only intentional discrimination.  Washington v. Davis, 426 U.S. 229, 239 (1976)).  To establish intentional discrimination, a showing must be made that the state official acted with the purpose of creating an adverse impact on an

---

[2] Although Plaintiff would also have to establish no rational basis for Defendants' conduct, the Court need not address this issue, given that Plaintiff fails to satisfy other requirements for the claim.

7

identifiable group — not simply with an awareness that adverse consequences would result from the state action:

> "Discriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.

Pers. Admin'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979).

Plaintiff's burden of demonstrating that Defendants purposefully discriminated against Katie "is a heavy one to satisfy," Sampson v. Town of Salisbury, 441 F. Supp. 2d 271, 279 (D. Mass. 2006), and requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," Rogers v. Lodge, 458 U.S. 613, 618 (1982). As one court has aptly noted, without the proverbial "smoking gun of an overtly discriminatory statement by a decisionmaker, it may be very difficult to offer sufficient proof of" discriminatory purpose. Soto v. Flores, 103 F.3d 1056, 1067 (1st Cir. 1997), cert. denied, 522 U.S. 819 (1997).

Defendants contend that Plaintiff cannot maintain her equal-protection claim, because she has offered no evidence that any differential treatment "resulted from a discriminatory intent." Defs. Br. at 17 (Dkt. 159); see also Defs. Reply at 3-4 (Dkt. 166). In response, Plaintiff's only argument is that Defendants knew Ed was a police officer, and that "they refer to this fact in every action they took." Pl. Resp. at 25 (Dkt. 165) (citing Pl. Exs. 1-3, 6-9). The Court agrees with Defendants.

While it is undisputed that both Falk and Schultz learned that Ed was a police officer, Plaintiff's assertion that "they refer to this fact in every action they took" is completely unsupported by any record citation. That alone is sufficient to dispose of the argument. See Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must

support the assertion by citing to <u>particular parts</u> of materials in the record[.]" (emphasis added));
<u>see also</u> <u>Gohl v. Livonia Pub. Schs.</u>, __ F. Supp. 3d __, 2015 WL 5729071, at *8 (E.D. Mich.
Sept. 30, 2015) ("Global, generic citations to multi-page exhibits without specific pinpoint
citations are inadequate to support or withstand a summary judgment motion.").

There are two incidents noted by Plaintiff where Schultz did reference Ed's status as a
police officer — but the circumstances do not evidence any intent to discriminate against Katie
or in Ed's favor.  Plaintiff refers to Schultz including Ed's occupation in a notice on Michigan's
LEIN.  Pl. Resp. at 25.  Yet nothing in the record suggests that this was done to treat Ed more
favorably.  The LEIN notice identifying Ed as an "endangered person" was prompted by Ed's
apparent suicide note, found by CPD officers at Katie's residence.  The LEIN notice stated that
Ed had left a suicide note, was intoxicated, and "[p]ossibly left house with handgun."  Schultz
Dep. at 71 (Dkt. 159-5); LEIN Worksheet (Dkt. 165-8).  It was eminently reasonable to include
Ed's law enforcement status, because other law enforcement officers, who might attempt to
detain Ed, would surely want to know whether an apparently unstable person, possibly in
possession of a weapon, was a police officer who would know how to use a weapon.

The second incident Plaintiff points to is Schultz contacting the DPD because Katie, Ed,
and Katie's boyfriend were all DPD officers.  Pl. Resp. at 25-26.  Again, nothing in the record
suggests that this was done to treat Ed favorably.  Indeed, Schultz explained that his reason was
to alert DPD that one of its officers might have a "fitness for duty" issue, Schultz Dep. at 160,
and to avoid a potential workplace disturbance, <u>id.</u> at 57 ("[I] wanted [DPD] to be aware of any
potential problems because all three people were DPD officers and there was a potential there for
a workplace issue, so I wanted to make them aware of a situation that [Canton] had with one of
their officers off duty").

Thus, in the only two incidents where Ed's occupation was referenced by one of the Defendants, the stated reasons were entirely consistent with legitimate law enforcement goals. They hardly demonstrate that Schultz treated Katie differently than other victims of domestic violence to favor Ed because of his occupation.[3]

At most, Plaintiff's evidence shows that Defendants knew that Katie's assailant was a police officer. Without citation to any evidence logically connecting Defendants' knowledge of Ed's police-officer status with any alleged disparate treatment, such that there would be a genuine dispute that Defendants' conduct was motivated by a desire to favor Ed because of his occupation, Plaintiff's equal-protection claims against Defendants fail.

To the extent Plaintiff attempts to argue that any of Defendants' alleged disparate treatment alone is sufficient to create a genuine issue of fact regarding whether such treatment was intentional, see Pl. Resp. at 26, that argument also fails. Even if the Court were to assume that Katie was treated differently than other victims of domestic violence, such disparity without evidence of discriminatory intent is, as a general matter, constitutionally insufficient. Soto, 103 F.3d at 1067 ("The mere existence of disparate treatment — even widely disparate treatment — does not furnish adequate basis for an inference that the discrimination was impermissibly motivated."). See also Sampson, 441 F. Supp. 2d at 280-281 (granting defendants summary

---

[3] Plaintiff's misinterpretation of the evidence is akin to her misinterpretation of an earlier defense brief, which had acknowledged that Ed's occupation played a role in some of Defendants' actions. Plaintiff claims that the earlier briefing constituted an admission regarding discriminatory intent, because the defense brief had stated that "the testimony shows this situation was handled differently based on Ed's status as a police officer." Pl. Resp. at 19 (quoting Defs. Reply to Pl. Resp. to First Mot. for Summ. J. at 6-7 (Dkt. 109)). But Plaintiff has wrenched the quoted language from the earlier defense brief out of context. The brief had explained that Ed's law enforcement status could not be ignored by CPD officers because his conduct showed that he might not be "fit for duty as a public service agent," prompting action, such as including Ed's law employment status in the LEIN notice. Defs. Reply to Pl. Resp. to First Mot. for Summ. J. at 7. Far from conceding discriminatory intent, the earlier defense briefing was part of an effort to show no discriminatory purpose in what the CPD officers did. Id.

judgment on plaintiffs' equal-protection claim because plaintiffs had "asserted nothing more than disparate treatment, which is insufficient to support an inference of intentional discrimination"); Holmes v. Godinez, 311 F.R.D. 177, 237 (N.D. Ill. 2015) (rejecting plaintiffs' argument that treating hearing-impaired inmates differently than hearing-abled inmates alone is sufficient to infer discriminatory intent, and granting defendant's motion for summary judgment because plaintiffs did not present "evidence on which a reasonable trier of fact could find that Defendant intentionally discriminated against Plaintiffs based on their disabilities").[4]

---

[4] In rare circumstances, disparate treatment itself may be sufficient to establish discriminatory intent. See Horner v. Ky. High Sch. Athletic Ass'n, 43 F.3d 265, 276 (6th Cir. 1994) ("The [Supreme] Court has made clear that the type of impact sufficient in itself to prove intentional discrimination is that which is significant, stark, and unexplainable on other grounds."). However, Plaintiff makes no effort to meet that stringent standard, nor could she. The alleged discrimination was hardly "stark," given that Katie is the only apparent victim subjected to the type of conduct Plaintiff challenges. See Giles v. Henry, 841 F. Supp. 270, 275 n.4 (S.D. Iowa 1993) ("In the related context of a claim of class discrimination, the facts of two or three individual cases [of discrimination] are 'insufficient to provide more than minimal support to an inference of classwide purposeful discrimination.'" (quoting Inmates of Neb. Penal & Corr. Complex v. Greenholtz, 567 F.2d 1368, 1381 (8th Cir.1977))). And Defendants' conduct is certainly explainable on grounds having nothing to do with an intent to favor Ed because of his law enforcement status, including: (i) Katie's refusal to identify herself or Ed when she first encountered Falk at the Canton police station; (ii) Katie's relatively minor injury when she appeared at the station; (iii) Katie's ultimate statement to Falk that she did not want a home escort; (iv) Falk's supervisor's agreement that a prosecutor should make the decision whether to pursue criminal charges; (iv) Falk going off-duty thereafter; (v) Schultz placing primary emphasis on locating Ed, because of his apparently suicidal ideation; and (vi) Schultz going off-duty after Ed surfaced. See infra note 5.

Although Plaintiff does not address this stringent standard, she does cite Cellini v. City of Sterling Heights for its statement that ". . . an unexplained discrepancy in the treatment of victims of domestic assault could legitimately give rise to an inference that the police department acted with discriminatory motive . . . ." 856 F. Supp. 1215, 1225 (E.D. Mich. 1994). However, Cellini is inapposite. In that case, the plaintiff challenged a police department policy that prohibited officers from arresting anyone for the misdemeanor offense of domestic assault unless the officer witnessed the assault; no such prohibition applied for non-domestic assaults. Because the department offered no explanation for such a distinction in policy, the court found this to be "an unexplained discrepancy" that could lead to an inference of discriminatory motive. By contrast, Defendants' conduct here is not unexplained.

In <u>Soto</u>, the First Circuit considered an equal-protection claim that was similar to the one presented in this matter.  In that case, the plaintiff had reported her husband's physical and emotional abuse to the police.  The police did not arrest the husband or take any steps to protect the plaintiff or her children.  Four days later, the plaintiff's husband murdered their two children and then killed himself.  <u>Id.</u> at 1058-1061.  The plaintiff brought an equal-protection claim, alleging that police officers intentionally treated victims of domestic violence differently than victims of other crimes, and discriminated on the basis of the complaining victim's sex.  <u>Id.</u> at 1065.  In concluding that the plaintiff had not adduced sufficient evidence of discriminatory intent to survive summary judgment, the court held that "purposeful discrimination is the condition that offends the Constitution," and, as such, "a showing of disproportionate impact alone is not enough to establish a constitutional violation."  <u>Id.</u> at 1067.

<u>Soto</u> applies here.  Because Plaintiff offers no appropriate evidence of discriminatory intent — just disparate treatment and knowledge of Ed's law enforcement status — the Court finds that Plaintiff has not presented evidence creating a genuine issue of fact that Defendants intentionally discriminated against Katie.  Because Plaintiff lacks evidence to support a necessary element for her equal-protection claim, Defendants are entitled to qualified immunity.[5]

---

In sum, this case is not one of disparate treatment that is "significant, stark, and unexplainable on other grounds."  Thus, evidence of discriminatory intent beyond disparate treatment is required.

[5] Plaintiff's unsubstantiated intent theory is, in fact, inconsistent with much of the evidence of this case, which shows that both Falk and Schultz took actions that were consistent with legitimate law enforcement practices and, far from favoring Ed, quite detrimental to him.  Falk sought information about Katie and the incident and repeatedly urged Katie to disclose Ed's identity, despite knowing that the suspect was a police officer.  Falk Dep. at 14-17 (Dkt. 159-2); <u>see also</u> 9/22/2009 Video Tr. at 5-9, 14 (Dkt. 165-1).  Obtaining such basic information for a civil standby is not only commonsense, it is "common practice."  Falk Dep. at 18.  Such information would also be needed for initiation of a criminal investigation.  <u>Id.</u> at 21-22.  When Katie balked at providing basic identifying information, Falk assured Katie that her assailant would not be "the first officer to ever get charged with a domestic."  9/22/2009 Video Tr. at 6;

**B. No Evidence That Similarly Situated Persons Outside Katie's Non-Suspect Class Were Treated More Favorably**

Plaintiff contends that Katie was treated less favorably than similarly situated victims of domestic violence whose assailants were not police officers. For instance, Plaintiff claims that, unlike in other cases of domestic violence, Falk failed to do the following in Katie's case: (i) provide a civil standby; (ii) file a domestic-violence report; (iii) provide Katie with a notice of her rights; (iv) request an arrest warrant; (v) provide assistance, even though the victim refused to provide personal information; and (vi) prosecute the suspect, notwithstanding the victim's wishes to the contrary. See generally Pl. Resp. at 19-21. Plaintiff also claims that Schultz failed to do the following in Katie's case: (i) attempt to arrest or seek an arrest warrant; (ii) enter a

Falk Dep. at 13. Despite being handicapped by Katie's reticence to cooperate fully, Falk prepared a report based on the limited information Katie provided him that Saturday night, and he submitted the report to his supervisor for approval. Falk Dep. at 22, 26-27. Falk and his supervisor then decided to "let the prosecutor make the determination on it," id. at 27 — an alternative that officers use when faced with limited or conflicting information, see Cox v. Hainey, 391 F.3d 25, 35 (1st Cir. 2004) ("[A]s a matter of policy, it makes eminently good sense, when time and circumstances permit, to encourage officers to obtain an informed opinion [from a competent prosecutor] before charging ahead and making an arrest in uncertain circumstances."). Falk stated that he did not know why the report that he had filed was never sent to the prosecutor's office, because he "didn't have anymore [sic] dealing with [that] situation after [he] filed this report." Id. at 29. Falk claims that the matter "was turned over to the other shift when they had the dealing out there at the house on Wall Street." Id. There was no evidence submitted that Falk should have assumed some ongoing responsibility for the matter after his shift had ended.

Similarly, Schultz placed Ed's name in LEIN mentioning the suicide note. See Schultz Dep. at 71. He also reported Ed's unstable mental health condition to DPD. Id. at 54, 57-59, 72. These actions clearly did not "favor" Ed. It is true that Schultz did not pursue a criminal investigation after Ed finally surfaced on Sunday evening. But Schultz explained that he did not pursue a criminal investigation of the alleged assault from the prior night because it was not his case, see id. at 106, 157-158, and he was off-duty immediately after he learned that DPD had determined "all was well with Ed," and remained off-duty for the following two days, id. at 17. On its face, Schultz's explanation for not pursuing a criminal investigation of Ed after he surfaced is entirely plausible and provides no basis to conclude that any lack of alacrity was premised on an intent to discriminate in favor of a police officer.

Thus, not only has Plaintiff failed to present any evidence that Falk and Schultz acted with discriminatory intent, she failed to address critical evidence inconsistent with her theory.

LEIN notice that included reference to alleged criminal conduct; (iii) question the suspect about the domestic violence; (iv) inform other law enforcement about facts relating to the domestic violence; (v) continue the investigation after the LEIN removal; and (vi) provide "victim assistance, referrals, or the written notice [of the victim's] rights." See generally id. at 22-23.

Assuming without deciding that Defendants treated Katie differently than other victims, Plaintiff has failed to raise a genuine issue of fact showing that: (i) those victims were similarly situated to Katie; or (ii) any class of favored victims whose assailants were not police officers even exists.[6]

## 1. Absence of Similarly Situated Persons

The hallmark of the Equal Protection Clause is that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). In opposing a motion for summary judgment, "it is plaintiff who possesses the burden of demonstrating that the defendants treated similarly situated individuals in a disparate manner." Buchanan v. City of Bolivar, Tenn., 99 F.3d 1352, 1360 (6th Cir. 1996); see also Wymer v.

---

[6] Although the Court's analysis assumes some disparate treatment, several of Plaintiff's examples of disparate treatment clearly lack merit. For instance, Plaintiff claims that Katie was treated differently because "Falk refused to provide a civil standby unless Katie consented to file an official report[.]" Pl. Resp. at 19-20. However, aside from the fact that Katie ultimately left the CPD station telling Falk that she did not want a standby, see 9/22/2009 Video Tr. at 18, Falk's alleged refusal to provide a standby does not demonstrate that Katie was treated differently than another victim, as Plaintiff never identifies another victim who also requested and/or received a civil standby. Similarly, Plaintiff does not identify any other case that involved Schultz entering or removing a LEIN notice. Thus, Schultz's conduct concerning the LEIN notice does not demonstrate that Katie was treated differently than any other victim of domestic violence. Nor has Plaintiff identified another victim to whom Schultz gave "victim assistance, referrals, or the written notice [of the victim's] rights." Pl. Resp. at 23. Absent such comparable evidence, these incidents do not amount to disparate treatment. Mata v. City of Kingsville, 275 F. App'x 412, 415-416 (5th Cir. 2008) (holding that plaintiff, a police officer's wife complaining of less favorable treatment of her report of domestic abuse than non-police wives' complaints, could not establish equal-protection claim where the record lacked comparative evidence of disparate treatment). Because not all of the claimed incidents of disparate treatment can be rejected on this basis, the Court's analysis assumes that there is at least some disparate treatment.

Richland Cnty. Children Servs., 584 F. App'x 283, 284 (6th Cir. 2014) ("To state [an equal protection claim], the [plaintiff] must allege that the defendants treated a similarly situated person better than they treated the [plaintiff].").

Courts do not require "exact correlation" when evaluating whether parties are similarly situated, but they do demand "relevant similarity." Loesel, 692 F.3d at 462; see also Nordlinger v. Hahn, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." (emphasis added)).

The "similarly situated" determination is often an issue of fact for the jury.  Loesel, 692 F.3d at 463.  However, a district court may grant summary judgment "where it is clear that no reasonable jury could find that the similarly situated requirement has been met."  Fares Pawn, LLC v. Indiana Dep't of Fin. Insts., 755 F.3d 839, 846 (7th Cir. 2014).  Indeed, the "similarly situated" analysis must be applied with "rigor" to maintain the Equal Protection Clause's "focus on discrimination" and to avoid "constitutionalizing" every encounter with a state actor.  Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1207 (11th Cir. 2007).  For its part, the Sixth Circuit does not hesitate to affirm a grant of summary judgment where a plaintiff fails to identify other similarly situated individuals.  See, e.g., Dixon v. Univ. of Toledo, 702 F.3d 269, 279 (6th Cir. 2012); EJS Props., L.L.C. v. City of Toledo, 698 F.3d 845, 865-866 (6th Cir. 2012); Bench Billboard Co. v. City of Cincinnati, 675 F.3d 974, 987 (6th Cir. 2012).

Of the 68 files produced during discovery pertaining to cases in which Schultz or Falk responded to a partner-on-partner domestic-violence situation, Plaintiff's response focuses on 18 domestic-violence cases involving Falk that pre-dated Katie's incident, Pl. Resp. at 19, and only two cases in which Schultz was involved in the investigation of a domestic-violence incident, id.

15

at 21 (citing Dkts. 165-23, 165-24).[7]   According to Plaintiff, these cases demonstrate that Katie was similarly situated to domestic-violence victims whose assailants were civilians, because "they involve allegations of partner on partner domestic violence wherein Falk or Schultz played an investigative role."   Id. at 20.   However, Plaintiff never meaningfully explains how the victims in any of those cases are similarly situated to Katie.   Nor does Plaintiff cite any particular parts of the record to support her assertion that Katie and the other victims were similarly situated.   See Fed. R. Civ. P. 56(c)(1)(A).   Therefore, Plaintiff has failed to carry her burden of demonstrating that Katie was similarly situated to other victims of domestic violence who received more favorable treatment.

Furthermore, the mere fact that Katie and the other victims were generally involved in a domestic altercation by itself is insufficient to make them alike in all relevant respects.   That level of broad generality deviates from the principle that the "similarly situated" analysis requires a focus on the salient circumstances of the particular context of the challenged action. As the Sixth Circuit said in Loesel:

> In determining whether individuals are similarly situated, a court should not demand exact correlation, but should instead seek relevant similarity.  Materiality cannot be evaluated in a vacuum. Inevitably, the degree to which others are viewed as similarly situated depends substantially on the facts and context of the case.

---

[7] In a reply brief in support of an earlier motion for summary judgment, Defendants argued that only those cases that pre-dated Katie's incident were relevant for purposes of comparison.  See Defs. Reply Br. at 1-3 (Dkt. 154).  Defendants appear to have continued this approach in their most recent motion for summary judgment, limiting their similarly situated analysis to those 18 cases involving Falk that pre-dated Katie's incident.  See Defs. Br. at 14-17.  Plaintiff's response similarly focuses on those 18 cases.  See Pl. Resp. at 19 ("Even when narrowing the comparable files to those that pre-dated this incident and where Falk was the officer in charge, in all 18 of those cases, Falk or another officer completed a D.V. Incident Report, the suspect was arrested on the scene or a warrant was requested within 24 hours (or both), and there is no indication that the suspect's occupation was taken into account.").  Because Plaintiff's response addresses only the cases involving Falk that pre-date Katie's incident, this opinion does as well.

Loesel, 692 F.3d at 462-463.  And that focus must be targeted to the specifics of the case, rather than reflect a broad brush approach.  See, e.g., Hope For Families & Cmty. Serv., Inc. v. Warren, 721 F. Supp. 2d 1079, 1162-1163 (M.D. Ala. 2010) ("The showing of a similarly situated comparator requires some specificity," and a "plaintiff will not be permitted to rely on broad generalities in identifying a comparator.").

Thus, in Dixon v. University of Toledo, the Sixth Circuit upheld summary judgment against a university human resources vice president who alleged that her dismissal, based on her public letter critical of university policies, was an equal-protection violation.  The plaintiff's theory was that another university official — a vice provost, who was not dismissed — had also made controversial public statements.  But the court held the "similarly situated" showing deficient, because the plaintiff had failed to establish what the duties of the vice provost were, making it impossible to compare that role to the plaintiff's.  702 F.3d at 279.  To the same effect is Patterson v. Stippoli, __ F. App'x __, 2016 WL 231532, at *3 (3d Cir. Jan. 20, 2016) (plaintiffs claiming selective enforcement of residential code violations must be compared to other "property owners deserving of the attention of the . . . code enforcement officers for the condition of their properties," not simply to all property owners).  For this reason, "[i]t is clear that similarly situated individuals must be very similar indeed."  McDonald v. Vill. of Winnetka, 371 F.3d 992, 1002 (7th Cir. 2004).

A higher order of generality for the "similarly situated" analysis will be tolerated where the state actor's decisionmaking is relatively simple.  Griffin, 496 F.3d at 1203 ("high order of abstraction" permitted in satisfying "similarly situated" requirement where challenged governmental decisions were "ultimately one-dimensional . . . involv[ing] a single answer to a single question").  But where the decisionmaking is "multi-dimensional, involving varied

decisionmaking criteria applied in a series of discretionary decisions," the state actor's challenged action "must be evaluated in light of the full variety of factors that an objectively reasonable governmental decisionmaker would have found relevant in making the challenged decision." Id. Thus, "when dissimilar governmental treatment is not the product of a one-dimensional decision . . . [,] the 'similarly situated' requirement will be more difficult to establish." Id. at 1203-1204.

Law enforcement decisions are highly discretionary.  See, e.g., Flowers v. City of Minneapolis, Minn., 558 F.3d 794, 799 (8th Cir. 2009) ("A police officer's decisions regarding whom to investigate and how to investigate are matters that necessarily involve discretion."); Mears v. McCulley, 881 F. Supp. 2d 1305, 1318-1319 (N.D. Ala. 2012) ("Investigating crimes, conducting searches, and making arrests are legitimate job-related functions within the discretionary authority of police officers.").  They are also typically far from simple, and require an officer to assess multiple factors in confronting a law enforcement challenge.  Thus, in Jennings v. City of Stillwater, 383 F.3d 1199 (10th Cir. 2004), the court affirmed summary judgment against a rape victim who sued a detective for failing to investigate her alleged rape by members of the Oklahoma State University football team with the same intensity as he had investigated other rape crimes, allegedly because the detective sought to protect the university. The court reasoned that the plaintiff had failed to raise an issue of fact as to the "similarly situated" requirement, stressing the multiple variables that officers must consider in making law enforcement decisions.  Id. at 1215 ("[T]he multiplicity of relevant (nondiscriminatory) variables requires plaintiff to provide compelling evidence of other similarly situated persons who were in fact treated differently."); see also Ricketts v. City of Columbia, Mo., 36 F.3d 775, 781 (8th Cir.

18

1994) ("[L]egitimately different factors may affect a police officer's decision to arrest or not to arrest in any given situation.").

Unquestionably, then, the "similarly situated" analysis to be applied in our case must reflect the multi-dimensional nature of the challenged law enforcement actions that are the subject of this action. Yet Plaintiff fails to take into account the specifics of our case with the specific circumstances of the comparative domestic-violence cases. The failure to engage in that analysis dooms Plaintiff's claim. Dixon, 702 F.3d at 279.

While Plaintiff shies away from analyzing the specifics of the comparative cases, this Court has not. It has reviewed the cases Plaintiff has submitted and concludes that the victims in those cases were not similarly situated to Katie. As the following analysis for the Falk and Schultz cases demonstrates, there are material differences between the comparative cases and ours.

 Plaintiff only attached 4 of the 18 cases that pre-dated Katie's incident that involved Falk's investigation of a domestic-violence situation. Because one of those cases also involved an assailant who was a police officer, see 8/16/2011 Case Report (Dkt. 165-28), it is not particularly instructive on the "similarly situated" requirement, as this victim belongs to the same class as Katie for purposes of the equal-protection analysis.[8] Based on the remaining three police reports provided, it is clear that no reasonable jury could find that Katie was similarly situated to the other domestic-violence victims.

In one case, CPD officers (including Falk) were called to and arrived at the scene of the alleged crime. Upon the officers' arrival, the victim fully identified herself and her husband, and

---

[8] Nevertheless, the victim in that case is not similarly situated to Katie. Unlike Katie, that victim called the police and, after they arrived on the scene, she provided information about her assailant and the circumstances of the assault, and expressed a desire to prosecute her assailant. See 8/16/2011 Case Report at 2-3, 6 (cm/ecf pages). And, unlike Ed, the suspect in that case was present at the scene of the incident. See id. at 2-3 (cm/ecf pages).

she described the circumstances of the threatened assault by her husband, who was present when the officers arrived.   12/14/2007 Case Report at 3 (cm/ecf page) (Dkt. 165-25).   The circumstances were materially different from our case, in that the victim and the suspect were readily identifiable and the suspect was available for arrest, unlike Ed, who was, at the time of Falk's encounter with Katie, unknown to Falk and not present.   Accordingly, the responding officers in the proposed comparative situation were in a position to provide assistance, by arresting the perpetrator and removing him from the home.   Moreover, the provision of a witness report coupled with the known identity of the assailant permitted Falk to request initiation of charges (which the prosecutor later denied due to insufficient evidence).   Id. at 9 (cm/ecf page).   Here, Katie chose not to provide any identifying information about herself or her assailant, opposed the filing of any report and did not provide any witness statement.   Katie also declined assistance in the form of a civil standby when Falk asked her before she left the station whether she still wanted one.   9/22/2009 Video Tr. at 6, 10-11, 14, 18.

In another case, when the officers arrived at the scene, the victim was "hysterical." 5/12/2009 Case Report at 2 (cm/ecf page) (Dkt. 165-26).   Falk noted that, upon his arrival, the victim was "screaming," "crying," and "began to throw up and spit blood into a bag."   Id.   Once the victim was able to calm down, she provided a detailed account of the domestic-violence incident between her and her boyfriend.   See id. at 2-3 (cm/ecf pages).   Unlike Katie — who only had a minor abrasion on her cheek, characterized as a "mark," 9/22/2009 Video Tr. at 6, or a "scratch," Falk Dep. at 16 — this victim stated that her assailant grabbed her by the hair and threw her to the ground, kicked her in the face and split her lip, stomped on her back and head, and punched her several times in the head and face with a closed fist.   5/12/2009 Case Report at 3 (cm/ecf page).   Due to the severity of the victim's injuries and her willingness to describe the

circumstances of the assault and her assailant in detail, this victim was not similarly situated to Katie.

In the last case, the victim called the CPD, claiming that his wife had physically assaulted him. 9/18/2013 Case Report at 2 (cm/ecf page) (Dkt. 165-27). Upon the officers' arrival, the victim offered identifying information about himself and his wife, as well as an account of the domestic-violence incident. According to the victim, his wife was bi-polar and was not taking her medication because she was pregnant. The two had gotten into an argument, and she repeatedly slapped the victim on his face with an open hand. Although the victim did not want to prosecute, Falk arrested the wife, who was both identifiable and present at the scene. Id. at 2-4 (cm/ecf pages). This incident was unlike our case, because the victim fully disclosed all details of the incident and the suspect was both readily identifiable and present to be apprehended.

Plaintiff has identified only two cases of domestic violence in which Schultz played some investigative role. Again, upon review, it is clear that no reasonable jury could find that Katie was similarly situated to these victims.

In one case, the domestic-violence victim initially called the Milan Police Department, but hung up. When the police called back, the victim informed them that her husband had assaulted her and had taken her from Canton to a hotel. Milan officers arrived at the hotel, arrested the husband for violation of a personal protection order, and then contacted the CPD. See 1/16/2011 Case Report at 4 (cm/ecf page) (Dkt. 165-23). Throughout the CPD's involvement in the matter, there is no indication that the victim refused to provide information to Canton officers; in fact, the victim was interviewed by Schultz, see id. at 3 (cm/ecf page), and expressed a desire to prosecute, see id. at 12 (cm/ecf page) (victim's written statement). Because the suspect was already in custody by the time CPD and Schultz became involved, there is no

21

evidence to suggest that the suspect was ever at large.  The circumstances clearly demonstrate that this case and Katie's case were not alike in all relevant respects.

In the other case, Schultz's involvement appears to have been limited to only interviewing the victim's son one day after the incident.  See 1/21/2011 Case Report at 2 (cm/ecf page) (Dkt. 165-24).  That interview provides no information about how the incident arose; whether the victim initially sought police assistance; whether the victim provided information about herself, her assailant, or the circumstances surrounding the incident; whether the victim sustained any injury or physical evidence of assault; or whether the assailant was present when officers responded to the incident.  Without any information about the victim or the circumstances surrounding that domestic-violence incident, Plaintiff is unable to demonstrate that Katie was similarly situated to that victim.

The comparative cases show marked differences from our case in that: (i) victims fully identified themselves and their assailants; (ii) victims were injured in demonstrably more serious ways than Katie was; and/or (iii) assailants were in the physical presence of the officers and available for questioning and arrest.  These are all factors that a reasonable police officer might take into account in making appropriate law enforcement decisions regarding investigation and arrest, and, as such, are appropriate factors in determining that the victims in the comparative cases were not similarly situated to Katie.  See United States v. Olvis, 97 F.3d 739, 744 (4th Cir. 1996) (persons "are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them"); Harajli v. Huron Twp., 365 F.3d 501, 508 (6th Cir. 2004) (affirming dismissal of equal-protection claim alleging lack of police response to plaintiff's complaint due to his gender and Arab ethnicity, because plaintiff failed to show that police had pursued investigations

in "similar circumstances" where the complaining party was a woman or non-Arab-American); see also McDonald, 371 F.3d at 1006 (plaintiff who alleged equal-protection violation based on fire department's arson investigation failed to establish that property owners whose fires were investigated were similarly situated, because plaintiff failed to meet requirement that "the evidence against the comparator must be 'as strong [as] or stronger' than that against the person arguing there has been an equal protection violation").

Because Plaintiff has not identified another victim to whom Katie is similarly situated, she has failed to carry her burden of raising a genuine issue of material fact concerning disparate treatment of a similarly situated domestic-violence victim. Accordingly, Plaintiff has not shown that Defendants violated Katie's constitutional right to equal protection, entitling them to qualified immunity on this basis as well.

## 2. Absence of Different Classes

Even assuming that Katie was similarly situated to the other victims of domestic violence, Plaintiff's equal-protection claims still fails, because there is no evidence that members of different classes were treated differently.

Disparate treatment between classes is a threshold requirement for a traditional equal-protection claim. See Marie v. Am. Red Cross, 771 F.3d 344, 361 (6th Cir. 2014); see also Lothes v. Butler Cnty. Juvenile Rehab. Ctr., 243 F. App'x 950, 956 (6th Cir. 2007) ("Disparate treatment is an inherent initial requirement of an equal protection violation."); Bassett v. Snyder, 951 F. Supp. 2d 939, 965 (E.D. Mich. 2013) (government may not discriminate between non-suspect classifications absent a rational basis for doing so). Only when the record evidence delineates which individuals fall into the allegedly favored class can a court then engage in a comparative analysis to determine whether or not one class was treated better than the other.

Thus, for example, in a racial discrimination case, if the available information does not reveal the race of individuals who were allegedly treated better than the minority plaintiff, there is no way to perform a comparison to determine disparate treatment.

According to Plaintiff, Katie belonged to an identifiable class of victims whose assailants were police officers.  Pl. Resp. at 18-19.  Thus, for purposes of comparison, the favored class would be composed of domestic-violence victims whose assailants were not police officers.  To establish the composition of the comparable class, Plaintiff claims that "Defendants produced 68 files pertaining to cases in which Schultz or Falk responded to a partner-on-partner domestic violence situation where the suspect was not a police officer."  Id. at 13.  This statement is inaccurate.

In support of the assertion that the other victims' assailants were civilians, Plaintiff relies only on the multipage declaration of Plaintiff's counsel's law clerk, see id. at 13 n.1, without pinpoint citation.  See Fed. R. Civ. P. 56(c)(1)(A).  The declaration states that the "68 files either did not state the suspected assailant's occupation or listed an occupation other than law enforcement."  Goddeeris Dec. ¶ 11 (Dkt. 165-21).  Thus, according to the declaration, there appears to be an unspecified number of cases where the occupation of the assailant was simply not known.  Without knowing whether an assailant was an officer, there is no way to determine whether a "favored" victim was in Katie's class of persons victimized by police-assailants or a member of another class of persons victimized by non-police assailants.  Consequently, there is no way to determine whether the "favored" class Katie is compared to did, in fact, exist.  Remarkably, Plaintiff never actually identifies any single victim as belonging to a class of domestic-violence victims whose assailants were known to be civilians.[9]

_____

[9] Although Plaintiff did not direct the Court's attention to the specifics of the police reports that she attached to her response (Exhibits 23-28), the Court reviewed them of its own accord.  Of

Assuming without deciding that Katie was intentionally treated differently than similarly situated victims of domestic violence, the Court is unable to determine whether members of <u>different classes</u> received differential treatment in the first place, because there is insufficient information regarding the assailants' occupations. Therefore, Defendants are entitled to qualified immunity on this third basis as well.

## IV.  CONCLUSION

For the reasons stated above, the Court concludes that Defendants Falk and Schultz are entitled to qualified immunity on Plaintiff's equal-protection claims and grants Defendants' motion for summary judgment (Dkt. 159).

SO ORDERED.


Dated:  March 30, 2016                                  s/Mark A. Goldsmith
     Detroit, Michigan                           MARK A. GOLDSMITH
                                            United States District Judge


## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 30, 2016.

                                        s/Karri Sandusky
                                        Case Manager

---

those reports, there was only one that indicated the occupation of the assailant; that assailant was a Detroit police officer. <u>See</u> 8/16/2011 Case Report at 2 (cm/ecf page) (Dkt. 165-28).