**NOT RECOMMENDED FOR PUBLICATION**
File Name: 17a0382n.06

No. 16-1557

**FILED**
Jun 30, 2017
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| **DEBORAH RYAN,** | ) | |
| | ) | |
| **Plaintiff-Appellant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **ON APPEAL FROM THE** |
| **CITY OF DETROIT, MI; SERGEANT** | ) | **UNITED STATES DISTRICT** |
| **BARBARA KOZLOFF; INSPECTOR DWANE** | ) | **COURT FOR THE** |
| **BLACKMON; CANTON TOWNSHIP;** | ) | **EASTERN DISTRICT OF** |
| **LIEUTENANT MARK SCHULTZ; and** | ) | **MICHIGAN** |
| **OFFICER ADAM FALK,** | ) | |
| | ) | |
| **Defendants-Appellees.** | ) | |

**BEFORE:  KEITH, ROGERS, and KETHLEDGE, Circuit Judges.**

ROGERS, Circuit Judge.  Plaintiff Deborah Ryan appeals the dismissal of her 42 U.S.C. § 1983 Equal Protection and Due Process claims against the City of Detroit and individual officers from the police departments of both the City of Detroit and neighboring Canton Township.  Ryan's daughter, Patricia "Katie" Williams, was murdered by her husband, Edward "Ed" Williams, who was a homicide detective for the Detroit Police Department.  Over the weekend leading up to the murder, both the Canton and Detroit police departments failed to detain Ed, despite both departments' knowledge of Ed's abusive and erratic behavior.  After her daughter's death, Ryan sued.  Ryan alleged that the Canton police officers' failure to detain Ed was due to intentional discrimination against Katie, which she argued violated Katie's Equal

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

Protection rights.  Ryan further alleged that the Detroit police officers' actions to remove Ed from a database of wanted or missing persons put Katie in danger, which violated Katie's Due Process rights.  The district court dismissed all of Ryan's claims on summary judgment, and she now appeals.  For the reasons set forth below, the district court's dismissal of Ryan's claims was proper.

## I.

Ed and Katie Williams[1] married in 2006.  Katie and Ed were both officers for the Detroit Police Department ("DPD")—Katie an instructor at DPD's Police Academy; Ed a detective in DPD's Homicide Division.  The couple lived in the Detroit suburb of Canton Township, Michigan.  By the summer of 2009, their marriage had deteriorated.  Ed moved out of the couple's former home.  Katie began dating another man, Clifford Lee, also a Detroit police officer.

On the evening of Friday, September 19, 2009, Ed came by the couple's former home and found Katie on the phone with Lee.  Ed became enraged.  He snatched Katie's phone from her, threw her car keys into the bushes in front of their house, and threw her to the ground when she went to pick up her keys.  Katie nevertheless grabbed her keys and fled.

Around midnight of the same day, Katie and Lee went to the Canton Police Department ("CPD").  There they spoke with Officer Adam Falk, who served as the desk officer at the station.  Falk is the first individual officer defendant in this case.

Katie told Falk that her soon-to-be-former husband had come by her house and attacked her, throwing her to the ground.  However, she said that she did not want to press charges, saying "He's a police officer, so I don't want . . . All I want to do is go to my house and get my stuff out

---

[1]Following the practice of the parties, we refer to Katie and Ed Williams by their first names.

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

of there."  She then asked for a civil standby—an officer to accompany her to her house in case her husband was still there.  Katie and Lee told Falk that they were DPD officers as well.

Falk responded by saying: "I understand.  You know, obviously I understand the situation, but with you coming in here and telling me that and something happens and I don't take a report, you know how it's gonna be, okay?  They'd hang me out to dry here. . . . This is all recorded.  All I can do is write up a report and let the prosecutor make the determination himself on whether they're going to charge him or not, okay?"  Falk also noted the evidence of assault: "You have a mark on the side of your face, okay.  There is evidence that a physical assault took place over there."

Katie again emphasized that she did not want to press charges against her husband or fill out a witness statement, because she did not want him to lose his job, and that she feared how he would respond if charges were brought against him.  She also repeated that she only wanted a civil standby to her house to pick up some things, in case Ed was still there.  Falk reemphasized the evidence of domestic violence, saying "there's obviously some kind of pattern going on here."  He also reemphasized his obligation to file a report: "The problem is, like you said, if— you know by law we're required to take that information if it's presented to us, okay.  And if we don't we can be criminally charged.  Our department is very, very strict when it comes to that."

However, Falk also appeared to yield somewhat to Katie's demands for leniency in Ed's favor.  He told Katie:

> All right.  Here's what I'm gonna do.  I'm gonna take this information down.  By law, as you guys know, I gotta write a report on it.  I'm not gonna—even if I talk to him or see him tonight I'm not gonna arrest him based on the information that you gave me, okay, but I am gonna write a report and it is gonna get faxed to the Wayne County prosecutor and they'll make the determination on it, okay?

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

He later added that "I'm not gonna put in the report that, you know—any of the—any—I'm gonna put in there basically all of what you told me that you don't want to go forth with it, you don't want him to lose his job."

Finally, towards the end of the conversation, Falk asked Katie: "What's your name?  Can I get your ID?"  Katie replied: "No, because you're going to write a report as soon as I give you my ID . . ."  Katie had also avoided giving up Ed's name at any time during the conversation. Katie and Lee left a few minutes later.  As they were leaving, Falk asked whether they still wanted a civil standby.  Katie replied that they did not.

Falk prepared a report on the incident.  The report largely repeated the information Katie had given Falk.  In particular, it noted that both the complainant and her husband were Detroit police officers.   The report also noted that Katie had declined to give her name, her identification, or her husband's name.  Moreover, the report was prepared on a form entitled "Civil Matter" and "Not a Crime," in contrast with the CPD's typical domestic violence incident report.  Falk also notified his commanding officer of his conversation with Katie and Ed.

Early on the morning of Saturday, September 20, Katie called her mother, Deborah Ryan, and asked Ryan to accompany her to her house to pick up some things.  Katie and Ryan arrived at the house at approximately 9:00 a.m.  Upon entering the house, Ryan found Ed sitting on the kitchen counter, holding a gun, with an empty liquor bottle next to him.  Ed became enraged.  He yelled at Ryan and Katie and waved his gun.  He showed Ryan and Katie that he had another gun strapped to his ankle.  He yelled at Katie and then grabbed her and tried to force her to get him something from out of the trunk of his car.  Ryan called 911.  She then told Ed that she had called the police.  In response, Ed fled.

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

Canton police arrived a few minutes later.  Two CPD officers searched the house and found a handwritten note in which Ed declared that he was "of sound mind (little pissed off though)" and that he wanted to "hereby leave all wordly possession [sic] to my mother, Wanda Williams.  That is to include all life insurance policies and bank accounts."  Based on this note, CPD officers feared that Ed might be suicidal.

CPD Lieutenant Mark W. Schultz then took over his department's response to Katie's case.  Before the 911 call, Schultz had been briefed that a DPD officer had come into the station the night before and complained that her DPD husband had attacked her.  Schultz had also been a part of the team that responded to Ryan's 911 phone call.  Schultz is the second individual officer defendant in this case.

Schultz reached out to the DPD Homicide Division where Ed worked and spoke with DPD Lieutenant Michael Martel.  Schultz told Martel that he wanted to give DPD a "heads-up" that "[w]e had a little incident today involving one of your officers Edward Williams."  Schultz recounted Katie's visit to the Canton police station the night before, Katie's encounter with an armed, intoxicated Ed at her house that morning, and Ed's note "leav[ing] all worldly possession to my  mother."  In response, Martel asked:  "Is there going to be an investigation?"  Schultz replied: "I don't think so.  No.  The domestic last night, she walked out.  Didn't really want to report anything.  So we—they did write a civil report last night, but we didn't have names or anything like that because they walked out without giving names."

Schultz also entered Ed as a "Wanted/Missing Person" into Michigan's Law Enforcement Information Network ("LEIN").  The LEIN is like a "big bulletin board system for police officers," on which an officer from one Michigan jurisdiction can enter a suspect or missing person into the system, and an officer from another jurisdiction can know what to do if he or she

-5-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

encounters that suspect or missing person.  Schultz's LEIN entry for Ed noted that he was a DPD officer who had been involved in a "domestic situation," had left a "suicide note," and had "left home with [a] handgun."  In a later deposition, Schultz testified that, had Ed remained in the LEIN, his department would have continued to try to get in touch with him, gotten in touch with his friends and family, put out a notice to other agencies to help find him, or even "pinged" his phone to find his location.

Sometime later, Schultz spoke with Martel again, as well as with DPD Sergeant Barbara Kozloff, who replaced Martel on duty at the Homicide Division at 4:00 p.m.  Schultz told both Martel and Kozloff that Ed had been entered into the LEIN and would be removed from the LEIN once he reported in person to either CPD or DPD to verify his mental status.  At one point, Martel gave Schultz Ed's cell phone number, and Schultz began trying to get in touch with Ed directly.  In turn, both Martell and Kozloff spoke with Lieutenant Dawyne Blackmon, their commanding officer.  Blackmon allegedly told Kozloff to "[m]ake physical contact with Officer E. Williams in order to cancel the missing status with CPD . . ."  Kozloff and Blackmon are the final two individual officer defendants in this case.

The situation changed at about 6:00 p.m., when Ed finally answered one of Schultz's phone calls.  Schultz told Ed that CPD police had found the note leaving his worldly possessions to his mother and asked "[a]re you going to hurt yourself?"  Ed replied that he would not.  Schultz told Ed that he had entered his name as a missing person in the LEIN, and that he could only remove Ed's name from the LEIN if "you either come in to see me or somebody here or you go down and see your supervisor in Detroit."  Ed told Schultz that he would go see his DPD supervisor.

-6-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

Ed then called Kozloff and agreed to meet face-to-face. Ed arrived at the DPD Homicide offices within a few minutes, and spoke with Kozloff in the parking lot outside the office for about ten minutes. According to Kozloff, Ed did nothing during this meeting to suggest that he was a threat to himself or others.

Kozloff then called Schultz back to report that she had talked with Ed, that Ed had assured her that he was fine. In response, Schultz asked, "And all is well?" Kozloff responded "Yes, it is." Kozloff also said she had recommended that Ed contact DPD's Personal Affairs, a counseling service for DPD officers. Based on this conversation with Kozloff, Schultz cancelled the LEIN notice. CPD did nothing further on the matter.

The next day, Sunday, September 21, Katie and Ed agreed to meet. Kate was clearly afraid of Ed, writing "U have key and I scared. I want to talk and figure things out but you are so calm it makes me think u will hurt me." Nevertheless, Katie agreed to meet, writing "We will talk tomorrow in public no guns!"

On Monday, September 22nd, sometime 8:00 and 9:00 a.m., Katie and Ed met in the parking lot of the Canton public library, which is next door to the Canton police station. At about 9:15 a.m., Ed went to his car and took out a handgun. He shot Katie three times as she tried to run away; and a fourth time in the back after she had fallen to the ground. He then shot himself in the head. Katie was pronounced dead upon her arrival at the local hospital. Ed was nonresponsive upon his arrival at the local hospital and died a few hours later.

Later discovery revealed CPD's policies for responding to domestic violence complaints. The CPD policy for domestic violence "[e]stablish[es] arrest as the preferred response to domestic violence." Under CPD policy, officers responding to domestic violence incidents are required to complete a departmental incident report in which they "document the reasons for the

probable cause determination made" whenever "factors related to domestic violence are alleged." However, the policy also notes an "officer's discretion [a]s an important component of the total response."  Furthermore, CPD officers should not consider "the wishes of either party concerning arrest or prosecution" and the "occupation of either party" in determining whether there is probable cause.  Finally, CPD officers should seek a warrant "if a [domestic violence] suspect cannot be located within a reasonable period of time (generally no longer than an officer's tour of duty) . . .."

Later discovery also produced a chart purporting to show how officers Falk and Schultz had responded in sixty-eight other partner-on-partner domestic violence calls.  Twenty of these were put into the record.  Falk was the responding officer in sixty-six of these cases, eighteen of which predated Katie's death in 2009.

The parties assume that Lieutenant Mark W. Schultz—the defendant in this case—was part of the team that responded to domestic violence in two cases reports.  However, upon close inspection, both reports appear to involve a different Schultz.  These two case reports involve a certain "Det. Brian Schultz," "Brian D. Schultz," or "Det. Schultz."  All these Schultzes are the same person, as evidenced by their shared rank and identification number.  However, none appears to be the same person as the defendant in this case—Lieutenant Mark W. Schultz.  The parties and the district court appear not to have noticed this discrepancy between Lieutenant Mark. W. Schultz and Detective Brian D. Shultz, treating the two officers at the same person.  In any event, we are given no explanation for the discrepancy.

In all of these case reports in the record, the suspect was either arrested, charged, or a warrant was requested and denied due to lack of evidence.  In all but two of these cases, Falk or another officer filed what appears to be CPD's standard domestic violence report, as opposed to

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

the "Civil Matter" report Falk filled out in Katie's case.  In at least three of cases, the victim declined to cooperate with the prosecution, but the investigation proceeded nonetheless.  In all but one case, the suspect's occupation was not mentioned; in the one case where the suspect's occupation was mentioned, the suspect was a DPD officer.  In that case, Falk filled out a domestic violence report and requested a warrant for the DPD officer, although a warrant was not issued.  Finally, during a deposition, a Deputy Chief for the Canton Police Department testified that he had run a computer word search of police records and uncovered two additional incidents where CPD officers besides Falk and Schultz responded to complaints of domestic violence by suspects who were police officers.  In both cases, the officers were arrested.

In 2011, Deborah Ryan brought suit in the Eastern District of Michigan on behalf of herself individual and as a personal representative of Katie's estate.  After several claims were dismissed vis-à-vis particular defendants, the litigation was winnowed down to the three claims now on appeal: (1) an Equal Protection claim under 42 U.S.C. § 1983 against CPD Officers Schultz and Falk; (2) a Due Process claim under § 1983 against DPD Officers Kozloff and Blackmon; and (3) claims against the City of Detroit and Canton Township for a custom, pattern, or practice resulting in constitutional violations within the meaning of *Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978).[2]

In response, the defendants asserted qualified immunity.  The district court agreed with the defendants, granting summary judgment in a series of orders on the grounds that the defendants were entitled to qualified immunity because they had not violated Katie's

---

[2]In addition to the claims against Officer Falk, Lieutenant Shultz, Sergeant Kozloff, Lieutenant Blackmon, and the City of Detroit, Ryan also initially brought a claim against Canton Township, the dismissal of which Ryan notes in her Notice of Appeal.  However, her opening brief does not identify Canton Township as a defendant at all, either in her issues presented or in her substantive argument, at oral argument her counsel appears to have conceded that Canton is no longer a defendant in this case.  Ryan has therefore abandoned her claim against Canton Township, *see United States v. Johnson*, 440 F.3d 832, 845-46 (6th Cir. 2006), and we do not consider it.

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

constitutional rights. With regard to Ryan's Equal Protection claim against Falk and Schultz, the district court held there was not enough evidence in the record either to prove discrimination or that any discrimination was intentional. With regard to Ryan's Due Process claim against Blackmon and Kozloff, the district court held that there was not enough evidence to prove that either officer affirmatively increased the risk of harm to Katie, rather than simply failed to act. Because the district court held that none of the defendants' conduct violated Katie's constitutional rights, it never reached the second step of the qualified-immunity test as to whether any constitutional rights were "clearly established." *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). Ryan now appeals.

## II.

On appeal, the judgment of the district court must be affirmed. There is not enough evidence in the record to show that any of the defendants violated Katie Williams's constitutional rights—let alone that any such rights were "clearly established." *See Saucier v. Katz*, 533 U.S. 194, 201-202 (2001). All of the defendants are therefore entitled to qualified immunity, and the district court was correct to dismiss Ryan's case on motion for summary judgment.

## A.

CPD Officer Adam Falk did not violate Katie's constitutional right to Equal Protection, because the other domestic violence cases in the record are different from Katie's case in a material respect, such that Ryan cannot show disparate treatment of similarly situated persons.

Ryan's Equal Protection claim is unusual. Ryan argues that Falk discriminated in his failure to provide protection to Katie, thereby violating her Equal Protection rights. She quotes our sister circuit for the proposition that "[a]lthough there is no general constitutional right to

-10-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

police protection, the state may not discriminate in providing such protection." *Watson v. City of Kansas City*, 857 F.2d 690, 694 (10th Cir. 1988). Furthermore, Ryan concedes that Katie was not targeted as a member of a suspect class and that none of Katie's fundamental rights were burdened—the two most common Equal Protection theories. *See Trihealth, Inc. v. Brd of Commissioners, Hamilton County, Ohio*, 430 F.3d 783, 788 (6th Cir. 2005). Instead, Ryan argues that Katie was intentionally treated differently because of her membership in an identifiable group—in this case, victims of domestic violence whose assailants were police officers. Because this identifiable group of domestic violence victims is not a suspect class, Ryan concedes that the state may discriminate against such a group so long as it has any rational basis for doing so. *See id.* However, Ryan argues that Falk had no rational basis for such discrimination.[3]

As a threshold matter for this Equal Protection claim against Falk, Ryan must establish that Falk treated similarly situated persons disparately. *See Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011); *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260-61 (6th Cir. 2006). To satisfy this requirement, Ryan points to the dozens of case files in the record where Falk responded to domestic violence complaints either by requesting an arrest warrant or by arresting the assailant, even when the victims declined to cooperate with police. Ryan contrasts Falk's treatment of these cases with his treatment of

---

[3]Ryan's Equal Protection claim is further complicated by the fact that she has put forth different Equal Protection theories during this litigation. She initially argued under a "class-of-one" Equal Protection theory, "the hallmark of [which] is . . . the allegation of arbitrary or malicious treatment not based on membership in a disfavored class." *Davis v. Prison Health Services*, 679 F.3d 433, 441 (6th Cir. 2012) (citations and quotations omitted)). However, she explicitly disavowed this theory on appeal. Instead, before this court she has focused on a "class-based" theory set forth above. At oral argument, her counsel complicated things further, called the case "a little bit of a tweener" between a class-of-one and a class-based argument. Nevertheless, this court need not decide which theory is proper, because both class-based and class-of-one theories require that plaintiffs show disparate treatment of similarly situated persons, at least when the evidence of discrimination is circumstantial rather than direct. *See United States v. Armstrong*, 517 U.S. 456. 465-66 (1996) (class-based, in this case race); *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011) (class-of-one).

-11-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

Katie's case, where Falk did nothing to arrest or seek a warrant for Ed and apparently yielded to Katie's wishes that Ed not be investigated.

However, as Canton Township points out, the problem with Ryan's argument is that Falk did not know Katie's or Ed's identities, making it much harder for him to investigate the case. In all the case files in the record, Falk was called to a particular address and was able to discover the identities of both the suspect and the victim. In contrast, in Katie's case, Falk talked to Katie in the Canton police station and Katie declined to give either her or Ed's name, such that Falk did not know the victim's identity, the assailant's identity, or even an address that could be tied to either the victim or assailant.

The question, therefore, is whether this difference made Katie's case so unusual that she was not similarly situated to the other victims of domestic violence. A plaintiff's proposed comparators need not be exactly similarly situated, and the question of whether persons are similarly situated may in some cases be a question of fact for a jury. *E.g.*, *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462-63 (6th Cir. 2012). However, we have upheld grants of summary judgment where no reasonable juror could find that the plaintiff's comparators were similarly situated in "relevant" or "material" respects. *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864-65 (6th Cir. 2012); *United States v. Green*, 654 F.3d 637, 650-62 (6th Cir. 2011). Falk's lack of information about Katie's or Ed's identities is a material respect that makes Katie's case unique. Simply put, Falk could not easily have investigated the case further without more information, such that his failure to investigate was clearly more justified.

Ryan makes two arguments against this conclusion. Both are unpersuasive.

First, Ryan points to the "subtle" factual point that Ryan announced that "I'm not gonna—even if I talk to him or see him tonight I'm not gonna arrest him based on the

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

information that you gave me, okay . . ." *before* Katie declined to give her information.  Based on this remark, Ryan argues that Falk would not have arrested or requested a warrant for Ed even if he had known Katie's or Ed's identity, such that this lack of information did not make Katie's case unique.  However, Falk's remark here was anomalous; he emphasized several other times in his conversation with Katie that he would have to take action based on what she told him, and did prepare a report on the incident that included all of the information he had.  It therefore is mere speculation that Falk would have followed through on his announcement but not on his other remarks that suggested he would take action.  Thus, this anomalous remark by Falk is not enough to create a genuine issue of material fact such that Ryan's claim against Falk must be submitted to a jury.

Second, Ryan argues that Canton's strong domestic violence policies means that her claim does not require additional comparator cases.  Ryan focuses on Canton's "sensitive" domestic violence polices which establish arrest as the preferred response whenever there is probable cause for domestic abuse, and instruct officers to disregard the victim's wishes in pursuing prosecution as well as the assailant's occupation.  Ryan argues that these policies show how victims of domestic violence cases should be treated, such that any deviation from these policies can establish disparate treatment of similarly situated persons, satisfying the threshold requirement for an Equal Protection claim without comparator cases.  To support this reasoning, Ryan cites *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, in which the Supreme Court reasoned that "[d]epartures from the normal procedural sequence also might afford evidence that improper purposes are playing a role.  Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." 429 U.S. 252, 267 (1977).

-13-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

Ryan's argument here is misplaced.  This language from *Arlington Heights* focuses on the question of whether there was "improper purpose," not whether there was disparate treatment of similarly situated persons.  Accordingly, Ryan's argument addresses the discriminatory purpose question of Equal Protection law, not the separate, threshold question of whether the defendant has treated similarly situated persons disparately.  Moreover, the Court did not rely on this reasoning in its ultimate holding that the local zoning authority had not discriminated on the basis of race.  *See id.* at 268-71.  While departures from policy may provide evidence of improper purpose, the Court in *Arlington Heights* made clear that such a conclusion emerges from "a clear pattern, [and] unexplainable grounds other than [the discriminatory classification]." *Id.* at 266.  Additionally, the Court stated that "such cases are rare."  *Id.*  In this case, Falk's deviation from policy does not necessarily show that he intended to discriminate against Katie because she was a domestic abuse victim whose perpetrator was an officer.

Furthermore, Canton's policy is not as comprehensive as Ryan's argument suggests: for example, the policy states that "When responding to a domestic violence call, the officers shall . . . [a]rrest the assailant *whenever possible* when probable cause is established that a crime(s) has been committed and the assailant committed the crime."  However, Falk could not comply with the policy because it was not possible to arrest Ed if Falk did not even know his identity.  Furthermore, although it is true that Canton's policy established arrest as the "preferred" response, that course of action was discretionary, and thus it does not follow that arrest is the only permissible response, especially in a case like this where arrest was not possible.

B.

CPD Lieutenant Mark Schultz also did not violate Katie's constitutional right to Equal Protection.  Ryan advances the same Equal Protection theory against Schultz as she does against

-14-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

Falk: that Schultz discriminated against Katie in the provision of police protection because Katie was a victim of domestic violence whose assailant was a police officer. However, Ryan's claim against Schultz fails for slightly different reasons than her claim against Falk. First, there are no comparators or other evidence in the record to show that Shultz treated similarly situated persons disparately. Second, Ryan has not established that any discrimination was because of and not in spite of its effects on her proffered group of victims of domestic violence whose assailants are police officer.

First, Ryan's claim against Schultz fails because she has not put forth sufficient evidence that Katie was treated differently from similarly situated persons, a threshold requirement for an Equal Protection claim. *See Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). To prove that Schultz's treatment of victims of domestic violence similarly situated to Katie was different, Ryan puts forth two comparator cases from 2011 that purport to show how Schultz responded domestic violence cases. However, as set forth in the above, both these reports appear to involve a certain "Det. Brian Schultz," "Brian D. Schultz," or "Det. Schultz," and not the defendant in this case—Lieutenant Mark W. Schultz. These Schultzes appear to be different people, with different first names, middle initials, and ranks. The district court does not appear to have noticed the discrepancy—treating to the two case reports as if they described Mark Schultz and not Brian Schultz—and we are given no explanation for this discrepancy on appeal. However, we review a grant of summary judgment determination de novo, and this discrepancy is important to our review. *See Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

This total lack of comparators is fatal to Ryan's case. The record suggests that Lieutenant Schultz did not do more to pursue Ed because he wanted to defer to Katie's wishes

-15-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

that Ed not be prosecuted. In particular, when asked whether Canton would pursue an investigation, Schultz replied: "I don't think so. No. The domestic last night, she walked out. Didn't really want to report anything." Deference to the victim's wishes was a violation of CPD domestic violence policies. But without any valid comparator cases, we cannot know how Schultz would have treated other victims. Perhaps he would not have so readily deferred to the victim's wishes if neither the victim nor the assailant were police officers. Or perhaps he would have inappropriately deferred to all victims' wishes, regardless of whether they or their assailants were police officers. With only a sample size of one, we cannot know either way. Nor is there any other evidence that show disparate treatment in lieu of comparator cases. In particular, violation of CPD policy cannot show disparate treatment by Schultz any more than it can show disparate treatment by Falk.

Second, Ryan's case against Schultz would still fail even if she could put forth the necessary comparators, because there is not enough evidence in the record to show the discriminatory purpose Ryan needs for her claim. "Discriminatory purpose" for an Equal Protection claim requires that a decisionmaker "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979); *accord Jones v. Union County, TN*, 296 F.3d 417, 427 (2002). In *Feeney*, a female plaintiff brought an Equal Protection challenge to a state hiring preference for veterans, which, because 98% of veterans at the time were men, inevitably disadvantaged women. 442 U.S. at 269. The district court held that this violated the Equal Protection Clause, reasoning that "the cutting-off of women's opportunities was an inevitable concomitant of the chosen scheme—as inevitable as the proposition that if tails is up, heads must be down. Where a law's consequences are that

-16-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

inevitable, can they meaningfully be described as unintended?"  *Id.* at 278.  The Supreme Court
came to the opposite conclusion, holding that even such inevitable consequences can be
described as "unintended" in the Equal Protect context.  *Id.* at 278  In answer to this question the
Court explained that "discriminatory purpose" must be more than mere "volition" or "awareness
of consequences," but requires that a "decisionmaker . . . selected or reaffirmed a particular
course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an
identifiable group."  *Id.*

Therefore, for Ryan's claim against Schultz to succeed, she must show that he acted
because of and not merely in spite of adverse effects upon Katie.  By his own words, Schultz
states that he intended to defer to Katie's wishes that Ed not be investigated: as he said when
asked whether CPD would investigate Ed: "I don't think so.  No.  The domestic last night, she
walked out.  Didn't really want to report anything."  Even if Schultz intended to defer to Katie's
wishes because Schultz wanted to benefit Ed because Ed was a police officer, that would not
enough to show that Schultz acted because of and not in spite of the adverse effects on Katie as
an individual or Katie as a member of an identifiable group of victims of domestic violence
whose assailants were police officers.  There is no hint in the record that Schultz had a desire to
treat Katie worse than other victims.  *Feeney* accordingly independently supports dismissal of
Ryan's claim against Schultz.

## C.

Last of all, the Detroit defendants—the City of Detroit, Sergeant Barbara Kozloff, and
Lieutenant Dwane Blackmon—did not violate Katie's Due Process rights.  Ryan's claim against
the Detroit defendants invokes the "state-created danger" doctrine of Due Process law.  The
Supreme Court has held that "[a]s a general matter, . . . a State's failure to protect an individual

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 197 (1989). The Sixth Circuit—along with several sister circuits—have interpreted this holding as supporting an exception for "state-created danger," which can occur when a state actor takes an "affirmative act" so as to "create[] or increase[] the risk that the plaintiff would be exposed to the injurious conduct of a private person." *Hunt* v. *Sycamore Community School District Bd. of Educ.*, 542 F.3d 529, 534 (6th Cir. 2008)

Ryan puts forth two affirmative acts that she argues "left Katie more vulnerable." The first is Blackmon's order to Kozloff to "[m]ake physical contact with Officer E. Williams *in order to cancel the missing status with CPD* . . ." The second is Kozloff's call to Schultz to report that "all is well." Both of these actions led Schultz to remove the LEIN notice on Ed. According to Ryan, this increased the danger to Katie, because "if Ed had remained in the LEIN, CPD would have used his cell phone to track him down and take him to a psychiatric unit for observation." To corroborate this argument, Ryan points to Schultz's deposition testimony that, had Ed remained on the LEIN, his department would have continued to try to get in touch with him, gotten in touch with his friends and family, put out a notice to other agencies to help find him, or even "pinged" his phone find his location.

There are at least two problems with Ryan's argument.

First, the Detroit defendants' actions at most returned Katie to the same level of danger she faced before the state action. To assess a state-created danger claim, this circuit asks whether the victim was safer before the state action than he was after it, or whether the victim was merely returned to the same level of danger she faced before the state action. *Koulta v. Merciez*, 477 F.3d 442, 446 (6th Cir. 2007). In this case, Katie was merely returned to the same level of

-18-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

danger she faced before the state action: Ed's actions showed he was a threat to Katie before he was put on the LEIN, and removing the LEIN merely reinstated the status quo. Thus, Katie's case is similar to other cases where this court has dismissed the plaintiff's state-created danger claim. For example, we have denied state-created danger claims when the police took a rape victim into protective custody but then returned her to her rapist, *Bukowski v. City of Akron*, 326 F.3d 702, 705-06, 709 (6th Cir. 2003), or when police discovered a drag race on city streets but then told participants they could "go ahead with the race," leading to a car crash that killed a spectator, *Jones v. Reynolds*, 438 F.3d 685, 696 (6th Cir. 2006). In both cases, we concluded that the police officers merely returned the victim to the same level of danger, such that a state-created danger Due Process claim was not viable.

Second, even if the Detroit defendants' actions had increased the danger to Katie, a genuine issue of material fact was not shown that there was a causal connection between these actions and Katie's death. Ryan argues that, had Blackmon and Kozloff acted differently, "CPD would have used [Ed's] cell phone to track him down and take him to a psychiatric unit for observation." As noted above, Ryan buttresses this claim from the record: Lieutenant Schultz testified as much during his deposition.

However, after this point, the causal chain breaks down. Even if CPD had tracked Ed down and taken him to a psychiatric unit, it is speculative that the psychiatric unit would not have quickly released Ed, freeing him to harm Katie. This attenuates the causal chain between Detroit's actions and Katie's death. By analogy, in *Culp v. Shantell Rutledge et al.*, the police promised to arrest an abusive ex-boyfriend but then failed to do so, which gave the boyfriend the opportunity to murder his ex-girlfriend's mother. 343 F. App'x 128, 136 (6th Cir. 2009). This court held that the chain of causation between the police's broken promise and the murder was

-19-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

too attenuated, because even if the police had arrested the ex-boyfriend, he "would likely have been able to post the $500 maximum bond authorized under Michigan's assault statute" and could have then murdered the victim anyway. *Id.*

Furthermore, Katie agreed to meet with Ed on the morning of September 22nd, which led to her death. This is an intervening cause that further attenuates the causal chain. By analogy, in *Carolyn Peach v. Smith County, TN*, *et al.* a domestic violence victim obtained a protective order against her abuser, but then agreed to spend the day with him shopping for their children's school clothes, after which she was murdered. 93 F. App'x 688, 690 (6th Cir. 2004). This court held that it was the victim who "independently and voluntarily chose to visit" the abuser, a fact that "serve[d] to break any alleged link between the murder and the actions of the . . . defendants." *Id.* at 693. The two attenuating circumstances set forth above rendered Ryan's causal reasoning too speculative for a reasonable jury to find in Ryan's favor.

Finally, Ryan brought a *Monell* claim against the City of Detroit. However, a municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2004) (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). As set forth above, Ryan's claims against Detroit officers Kozloff and Blackmon were properly dismissed. Therefore, her claims against the City of Detroit were properly dismissed as well.

III.

For the reasons set forth above, the judgment of the district court is affirmed.

-20-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

KETHLEDGE, Circuit Judge, concurring in part and dissenting in part.  I would allow Ryan's equal-protection claim against Officer Schultz to proceed to trial.  For Ryan to prevail on that claim, she needed to prove two things: first, that Schultz took some action that was "adverse" to Katie's interests; and second, that he acted with "discriminatory intent."  *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir. 2000).  To establish discriminatory intent, Ryan needed to show that Schultz intended either to hurt Katie because she was a member of an identifiable group or to benefit Ed because he was a member of one.  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269-70 (1993) (intent to harm women); *Miller v. Johnson*, 515 U.S. 900, 924-25 (1995) (intent to benefit African Americans).

A reasonable jury could find that Ryan met that burden.  Schultz's failure to arrest Ed harmed Katie because, if Schultz had put Ed in jail on September 20, then Ed likely still would have been detained on September 22, which is when he murdered her.  And a jury could easily find that the reason Schultz chose not to arrest Ed was that Ed was a fellow police officer.  Per Canton Police Department policy, Schultz was required to arrest domestic assailants "whenever possible."  R. 106-7 at PageID 2164.  And Schultz himself conceded that he had probable cause to believe that Ed had assaulted Katie.

Schultz responds that he let Ed go free because, Schultz says, he was worried about Ed hurting himself.  And Schultz says that he later mistakenly assumed that Officer Falk would find and arrest Ed.  But both responses are pure jury argument.  Nor are they particularly strong ones.  If Schultz's goal was to prevent Ed from hurting himself, then taking him into custody was probably the surest way to do that.  And though Schultz now claims that he thought Falk was taking over the investigation, Schultz himself told the Detroit Police that his department did not

-21-

No. 16-1557
*Deborah Ryan v. City of Detroit et al.*

plan to investigate Ed's assault on Katie. Thus, a jury could decide that, but for Ed being a police officer, Schultz would have arrested him.

That Ryan has evidence enough to prove causation should render irrelevant the fortuity of whether Schultz happened to let other domestic-violence suspects go free as well. In cases like this one, the "similarly situated" requirement serves as a proxy for proving that the defendant's discriminatory intent was a but-for cause of the plaintiff's harm. *See Gutzwiller v. Fenik*, 860 F.2d 1317, 1325-26 (6th Cir. 1988); *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001). Ryan has ample proof of that here. Nor do I think that the Supreme Court's decision in *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979), requires us to affirm the district court's judgment. I read *Feeney* simply to mean that, to violate the Equal Protection Clause, governmental action must be taken "because of" its effect on an identifiable group—not that the intended effect must always be adverse. *Id.* at 279. Indeed, later cases clarify that, if the government takes an action intended to benefit a group, the action is subject to the same level of constitutional scrutiny that would apply if the action burdened the group. *See Miller*, 515 U.S. at 924-25; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 218-22 (1995).

I therefore respectfully dissent from Section II.B of the majority opinion, which affirms the district court's grant of summary judgment to Schultz. Otherwise, I concur in the majority's well-reasoned opinion.

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
Deborah S. Hunt                    POTTER STEWART U.S. COURTHOUSE                    Tel. (513) 564-7000
Clerk                               CINCINNATI, OHIO 45202-3988                     www.ca6.uscourts.gov

Filed: June 30, 2017

Mr. Douglas J. Curlew
Cummings, McClorey, Davis & Acho
33900 Schoolcraft Road
Livonia, MI 48150

Ms. Linda Denise Fegins
City Of Detroit Law Department
2 Woodward Avenue
Suite 500
Detroit, MI 48226

Mr. Mark Granzotto
Law Office
2684 Eleven Mile Road
Suite 100
Berkley, MI 48072

Re:  Case No. 16-1557, *Deborah Ryan v. City of Detroit, et al*
     Originating Case No. : 4:11-cv-10900

Dear Counsel,

   The Court issued the enclosed Opinion today in this case.

Sincerely yours,

s/Jill Colyer on behalf of Karen S. Fultz
Case Manager
Direct Dial No. 513-564-7036

cc: Mr. William H. Goodman
    Ms. Julie H. Hurwitz
    Ms. Kathryn Bruner James
    Mr. Edward E Salah
    Mr. David J. Weaver

Enclosure

Mandate to issue